In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3920

Central States, Southeast and Southwest
  Areas Pension Fund, et al.,

Plaintiffs-Appellants,

v.

Basic American Industries, Inc., et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 C 4736--Blanche M. Manning, Judge.

Argued May 8, 2001--Decided June 5, 2001


  Before Bauer, Posner, and Coffey, Circuit
Judges.

  Posner, Circuit Judge.  The Multiemployer
Pension Plan Amendments Act, 29 U.S.C.
sec.sec. 1301 et seq., requires an
employer that withdraws from a plan which
is not overfunded to pay a "withdrawal
liability" calculated to avoid shifting
the cost of that employer's pension
obligations to the other employers. E.g.,
Milwaukee Brewery Workers' Pension Plan
v. Jos. Schlitz Brewing Co., 513 U.S.
414, 416-17 (1995); Central States,
Southeast & Southwest Areas Pension Fund
v. Hunt Truck Lines, Inc., 204 F.3d 736,
739 (7th Cir. 2000); Central States,
Southeast & Southwest Areas Pension Fund
v. Creative Development Co., 232 F.3d
406, 408-09 (5th Cir. 2000). The district
court dismissed this suit by the Central
States multiemployer pension plan for
payment of withdrawal liability as barred
by the Act's six-year statute of
limitations. 29 U.S.C. sec. 1451(f). A
brief chronology will aid in focusing the
issue.

  On June 22, 1989, a trio of affiliated
corporations (collectively "Allied
Grocers"), employers that were members of
the Central States plan, declared
bankruptcy under Chapter 11 of the
Bankruptcy Code. According to Central

States, the declaration of bankruptcy entitled it, under the terms of the multiemployer plan, to declare that Allied was in default of its withdrawal liability obligations, though it had not yet actually withdrawn from the plan. The statute defines "default," so far as bears on this case, as "any . . . event defined in rules adopted by the plan which indicates a substantial likelihood

that an employer will be unable to pay its withdrawal liability." 29 U.S.C. sec. 1399(c)(5)(B). Central States' plan makes an employer's declaration of bankruptcy a default. And under the statute a default entitles a plan to "require immediate payment of the outstanding amount of an employer's withdrawal liability." sec. 1399(c)(5); Board of Trustees v. Kahle Engineering Corp., 43 F.3d 852, 854 (3d Cir. 1994).

On May 18 of the following year, with the Allied bankruptcy still pending, Central States filed a proof of claim in the bankruptcy proceeding, claiming that Allied owed it a withdrawal liability obligation of some $752,000 and setting forth an installment schedule on which it wanted to be paid. Two weeks later, on June 2, Allied ceased operations, a move that effected, as a matter of law, its complete withdrawal from the plan. sec. 1383(a)(2); Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of California, Inc., 522 U.S. 192, 196 (1997); Central States, Southeast & Southwest Areas Pension Fund v. Sherwin-Williams Co., 71 F.3d 1338, 1341-42 (7th Cir. 1995). Two weeks after that, on June 18, 1990, the plan sent Allied a notice, and demand for payment, of withdrawal liability in the exact amount of the proof of claim in the bankruptcy proceeding, to be paid in 14 equal monthly installments, the first due on August 1--just as requested in the proof of claim. The record is silent on whether the automatic stay was lifted to permit Central States to make a demand outside of bankruptcy; later we'll see that it is uncertain whether the stay must be lifted to permit such a demand.

On December 27, 1995, Central States and Allied settled the dispute over Allied's withdrawal liability, agreeing that it was $526,000, which became a nonpriority

unsecured claim in the bankruptcy. The record is silent on whether any part of the claim was ever paid or whether Allied emerged from its Chapter 11 bankruptcy as an operating company.

Central States brought this suit on July 31, 1996, not against Allied but against Basic American Industries, Inc. and other companies under common control with Allied and therefore jointly and severally liable for Allied's withdrawal obligation. 29 U.S.C. sec. 1301(b)(1). Some defendants were added later by an amended complaint and there is an issue whether the original defendants were served with process in a timely fashion, but we can avoid these matters and confine our attention to the statute of limitations issue. The suit seeks the same amount as the proof of claim filed in the Allied bankruptcy proceeding and the demand for payment from Allied made by Central States in June of 1990. (There is no suggestion, as yet anyway, that the settlement with Allied capped Central States' claim against the affiliates.) The suit was filed more than six years after the proof of claim, the complete withdrawal by Allied from the plan, and the demand for payment, although less than six years after the first and all subsequent installment payments of Allied's withdrawal liability were due. Central States argues that the statute of limitations did not begin to run for the first of the installments until Allied failed to pay it on August 1, 1990, and for the later installments until their due dates passed without payment.

Central States fastens on the Supreme Court's statement in Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of California, Inc., supra, 522 U.S. at 195, that the MPPAA's six-year statute of limitations does not begin to run "until the employer fails to make a payment on the schedule set by the fund," and, as a backup, on the further statement in that opinion that "each missed payment [of an MPPAA installment obligation] creates a separate cause of action with its own six-year limitations period." Id. The first statement, as the Court's opinion makes clear, is limited by its context, which did not include bankruptcy. The employer in Bay Area ceased operations and withdrew from the plan, whereupon the plan computed the

employer's withdrawal liability and demanded payment of it in installments on specified dates. The plan's cause of action accrued, the Supreme Court held, when the employer failed to make the first payment on time. The plan could not have sued earlier because until then the employer had not defaulted on its withdrawal obligation. And since the plan did not invoke the default as a basis for accelerating the due dates of the subsequent installments, those installments were not defaulted until their due dates arrived and the employer again failed to pay. In so holding, the Court expressly rejected (id. at 206, 209-10) the contrary view that we had expressed in Central States, Southeast & Southwest Areas Pension Fund v. Navco, 3 F.3d 167, 171-72 (7th Cir. 1993).

The Court did not suggest and it would have been contrary to the thrust of its opinion, which (again rejecting our position in Navco, see 522 U.S. at 208-09) was to assimilate statute of limitations issues under the Multiemployer Pension Plan Amendments Act to the legal principles generally applicable to statutes of limitations issues, id. at 195, 208, 210, to suggest that the only way in which the payor in a contract can default is by failing to pay when payment becomes due. One way is by repudiating the obligation to pay; anticipatory repudiation is a breach of contract that entitles the payee to sue without waiting for the date when payment was due to come and go. E.g., Roehm v. Horst, 178 U.S. 1, 18-19 (1900); Wisconsin Power & Light Co. v. Century Indemnification Co., 130 F.3d 787, 793 (7th Cir. 1997); Nashville Lodging Co. v. Resolution Trust Corp., 59 F.3d 236, 245 (D.C. Cir. 1995); E. Allan Farnsworth, Contracts sec.sec. 8.20-.23 (3d ed. 1999). There is an exception: if the payee has completely performed his side of the contract and is just awaiting payment, he can't declare a breach and sue for immediate payment just because he has reason (even compelling reason) to doubt that the other party will pay when due. E.g., Roehm v. Horst, supra, 178 U.S. at 17-18; Restatement (Second) of Contracts sec. 243(3) (1981); Farnsworth, supra, sec. 8.20, pp. 602-03 (3d ed. 1999). The idea behind this dubious rule seems to be that, having performed, the payee can no longer protect himself

against nonpayment by suspending performance. In other words, anticipatory repudiation (sometimes called anticipatory breach) is conceived of primarily as a trigger of a contract party's right of self-help, like the breach of a condition in a contract. See C.L. Maddox, Inc. v. Coalfield Services, Inc., 51 F.3d 76, 81 (7th Cir. 1995); First National Bank v. Continental Illinois National Bank & Trust Co., 933 F.2d 466, 469 (7th Cir. 1991); American Hospital Supply Corp. v. Hospital Products Ltd., 780 F.2d 589, 599 (7th Cir. 1986); Farnsworth, supra, sec. 8.20, p. 600.

Why the doctrine of anticipatory repudiation should be so limited eludes our understanding. Announcement by the other party that he has no intention of paying should entitle the prospective victim of the payor's breach to take immediate steps to protect his interest, as by suing. Against this it has been argued that the doctrine of anticipatory repudiation "will not intercede to rescue the promisee from the consequences of the absence of an acceleration clause." Rosenfeld v. City Paper Co., 527 So. 2d 704, 706 (Ala. 1988); cf. First State Bank v. Jubie, 86 F.3d 755, 760 (8th Cir. 1996). That gets it backwards. Acceleration clauses are inserted to fill a hole in the law of contracts, which has failed here in its traditional and important function of interpolating rights and duties that the parties can be expected to negotiate for, e.g., In re Modern Dairy of Champaign, Inc., 171 F.3d 1106, 1108 (7th Cir. 1999), and thus of economizing on the costs of transacting. Acceleration clauses are a standard contract provision for protecting the payee against the consequences of a breach by the other party; they would be unnecessary were it not for the rule carving out the completed-performance case from the operation of the doctrine of anticipatory repudiation. In any event, the exception is inapplicable here because the Central States plan continues to be obligated to pay the pensions of Allied's former employees.

Our disapproved Navco case had involved, in fact, both bankruptcy and repudiation; but these features of the case had played no role in our analysis (which was based on an interpretation of the MPPAA) and

were neither involved nor mentioned in Bay Area. There is nothing in the latter decision to suggest that they are immaterial. All Bay Area holds or implies, at least so far as the present case is concerned, is that withdrawal from the plan is not an automatic default of the obligations that such withdrawal imposes and neither is missing one installment payment of withdrawal liability a default of the entire withdrawal liability. There is nothing in the opinion or its logic to suggest that the principles of anticipatory repudiation have no role to play under the MPPAA, unless those principles were stretched so far out of shape that, for example, failure to make a single installment payment were deemed repudiation per se of the entire obligation.

So we proceed to the question whether there was in fact a repudiation here and if so when it occurred. Filing for bankruptcy, though by virtue of the automatic stay it prevents the payee from invoking the usual remedies for breach of contract, 11 U.S.C. sec. 362; Buckley v. Bass & Associates, No. 00-3054, slip op. at 4 (7th Cir. May 7, 2001), and enables the contract if still executory to be rescinded by the trustee in bankruptcy (or debtor in possession, if, as in this case at the relevant time, there is no trustee), sec. 365(a), is not anticipatory repudiation per se. For the trustee or debtor in possession can affirm the contract even if it contains a clause (a so-called "ipso facto" clause) that makes filing for bankruptcy a ground for termination. sec. 365(e)(B); Lyons Savings & Loan Ass'n v. Westside Bancorporation, Inc., 828 F.2d 387, 393 n. 6 (7th Cir. 1987); McAndrews v. Fleet Bank of Massachusetts, N.A., 989 F.2d 13, 17 (1st Cir. 1993). Affirmance is the opposite of repudiation, and the affirmance option thus makes it impossible to consider the declaration of bankruptcy itself, whether or not there is an ipso facto clause, a repudiation of a creditor's claim.

If the trustee or debtor in possession exercises the discretion that the Code gives him to reject the contract, that of course is repudiation. See Central Trust Co. v. Chicago Auditorium Ass'n, 240 U.S. 581, 589-90 (1916). But Allied, when in

June 1989 it declared bankruptcy, didn't repudiate its withdrawal liability. It was still making contributions to the fund and there was a possibility that it would regain its financial footing (remember that it filed for reorganization under Chapter 11, not liquidation under Chapter 7). It might never withdraw from the fund and even if it did it might still be able to pay the withdrawal liability. Indeed, it did not yet have any withdrawal liability, for that liability attaches only when the employer "completely withdraws" from the multiemployer plan, 29 U.S.C. sec. 1381(a), which occurs only when he either "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." sec. 1383(a); see Corbett v. MacDonald Moving Services, Inc., 124 F.3d 82, 84 (2d Cir. 1997); PBGC Opinion Letter 87-1, 1987 WL 68403 (Jan. 23, 1987). Merely filing for the protection of the bankruptcy court is not a repudiation of obligations or a cessation of operations. More broadly, insolvency, with or without a declaration of bankruptcy, does not equal dissolution. An insolvent firm is not necessarily out of business, and the parties with which it has contracts cannot automatically assume that the firm will default, Farnsworth, supra, sec. 8.21, p. 608 n. 16 and sec. 8.23, p. 613; Martin v. Maldonado, 572 P.2d 763, 770 n. 22 (Alaska 1977); Arizona Title Ins. & Trust Co. v. O'Malley Lumber Co., 484 P.2d 639, 647 (Ariz. App. 1971); Restatement (Second) of Contracts, supra, sec. 252 comment a, although it can of course be a very ominous signal, entitling a creditor to demand security. E.g., id.; Arizona Title Ins. & Trust Co. v. O'Malley Lumber Co., supra, 484 P.2d at 647; cf. UCC 2-609.

The plan in this case contains an ipso facto clause. For it permits Central States to treat a member's declaration of bankruptcy as a default upon the occurrence of which "the outstanding amount of the withdrawal liability shall immediately become due and payable." The defendants' argument that the clause was even more--was a Doomsday Bomb requiring Central States, whether it wanted to or no, to treat the declaration of bankruptcy as a default--is contrary to the plan's terms, which are permissive

rather than mandatory, cf. Greenhouse Patio Apartments v. Aetna Life Ins. Co., 868 F.2d 153, 155-56 (5th Cir. 1989), and is bad policy as well, for reasons stated in Board of Trustees v. Kahle Engineering Corp., supra, 43 F.3d at 859 and n. 7. (Briefly, declaring a default may, by increasing the bankrupt's obligations, make it more difficult for the bankrupt to regain its financial footing and pay off the claims against it.) But even read permissively, the default clause in the Central States plan is an ipso facto clause; and it is highly doubtful in light of the cases and considerations marshaled above that the MPPAA authorizes such clauses.

So by filing a proof of claim for the entire withdrawal liability that Allied would owe if it withdrew (remember that the declaration of bankruptcy was not itself a withdrawal), Central States was jumping the gun. No withdrawal liability had yet arisen or could be precipitated by the bankruptcy (because ipso facto clauses are unenforceable). Neither in June 1989 when Allied filed for bankruptcy, nor May 18 of the following year when Central States filed its proof of claim, had a cause of action for withdrawal liability arisen. The statute of limitations therefore did not begin to run on either date.

But it did begin to run--still more than six years before Central States sued--no later than June 18, 1990, when, Allied having ceased operations on June 2, Central States served on Allied a formal demand for payment of the withdrawal liability set forth in the proof of claim that it had filed in the bankruptcy proceeding. Complete cessation of operations precipitates, as we have seen, the employer's (and any affiliates') withdrawal liability. That was the default, and the demand determined its amount (before that determination, a suit would have been premature). It is true that Central States could not insist on immediate payment until the employer had a chance to invoke its right to arbitrate the amount of its withdrawal liability. 29 U.S.C. sec. 1401; Chicago Truck Drivers, Helpers & Warehouse Union (Independent) Pension Fund v. Century Motor Freight, Inc., 125 F.3d 526, 533 (7th Cir. 1997). Allied's duty to pay Central States would have been suspended

by virtue of this rule until December 25, 1990, but the cause of action did not arise then--the right to arbitration presupposes that the cause of action has already arisen and has now to be adjudicated.

As a detail, we note that although "demanding" payment from a debtor in bankruptcy other than in the bankruptcy proceeding itself is normally a violation of the automatic stay, the demand for payment of withdrawal liability is probably an exception to this principle. Central States, Southeast & Southwest Areas Pension Fund v. Slotky, 956 F.2d 1369, 1372, 1375-76 (7th Cir. 1992). As a further detail, we note that it is arguable that the statute of limitations actually began to run earlier than June

18, on June 2, since Central States had already computed the withdrawal liability and sent notice of the amount, via the proof of claim, to Allied, substantially complying with the statutory requirement for notice of and demand for withdrawal liability. 29 U.S.C. sec. 1399(b)(1); Central States, Southeast & Southwest Areas Pension Fund v. Koder, 969 F.2d 451, 453 (7th Cir. 1992). But this we need not decide, as the decision would not affect the outcome of the case.

Surprisingly, Central States has failed to make the strongest argument available to it for the timeliness of the suit, which is that the fact that it demanded payment on the installment plan shows that it didn't think Allied had defaulted. But the argument would not have succeeded even if it had been made. The statute required Central States to formulate an installment plan. sec. 1399(b)(1); Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of California, Inc., 522 U.S. 192, 196 (1997). And the reason for the requirement has nothing to do with determining when a default has occurred. The reason is that Congress conceived of withdrawal liability as a substitute for the annual payments that the employer would have made to the multiemployer pension fund had he not withdrawn. Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co., supra, 513 U.S. at 418-19; H.R. Rep. No. 96-869, 96th Congress, 2d Sess., 1980

U.S.C.C.A.N. 2918. The Supreme Court made clear in Bay Area that the statutory requirement does not prevent the fund from accelerating all future payments upon default, 522 U.S. at 210, thus making all the installments due at once. See also Board of Trustees v. Kahle Engineering Corp., supra, 43 F.3d at 857, 861.

So the only question is whether there was a default. There was. When Allied ceased operating, Central States knew it would never see any of the scheduled installment payments. It had an unsecured claim, so Allied could not make any of the installment payments without violating the absolute priority rule of 11 U.S.C. sec. 1129(b). With fewer assets than claims, Allied would certainly pay the fund less than the full value of its claim. The best the fund could hope for was a partial settlement of the withdrawal liability. It should therefore have concluded on June 2, 1990, that Allied had repudiated its withdrawal liability. Put differently, on that day it became clear that Allied had disabled itself from paying the withdrawal liability. The standard rule in contract law is that the promisee is free to sue for anticipatory repudiation as soon as the promisor has disabled itself from performing its contractual obligations. See, e.g., Restatement (Second) of Contracts, supra, sec. 250(b). All that remained to complete the cause of action was to determine the amount due, which happened, at the very latest, on June 18, more than six years before the suit was brought.

Central States argues finally that even if it could not, by reason of the statute of limitations, sue to recover the payment due on August 1, 1990, a suit or suits for the subsequent installments was not barred. But there is no relevant difference among the installments. All specified payments on dates within the six-year limitations period; if as we have just held a suit to collect the first installment nevertheless was barred by reason of acceleration, so were suits to collect all the subsequent ones.

We are not such skeptics as to deny the possibility of commercial miracles. Even if it seemed certain on June 2, 1990, that Allied would not be able to pay the

first installment of its withdrawal liability due two months later, there was always the chance that, say, 16 months later, when the last installment was due, Allied would have had a miraculous recovery and could pay at least that installment. For all we know, it has had a miraculous recovery; the record is silent on whether and in what condition Allied emerged from bankruptcy. But all that is irrelevant. For it is unquestioned that if there was a default on June 2 or 18, Central States was entitled to accelerate the due date of all the installments to the present; the fourteenth installment became due immediately. Anyway the doctrine of anticipatory repudiation does not traffic in the miraculous. A breach occurs when it is reasonably certain that the other party is not going to meet its obligations under the contract in timely fashion. At that point the potential victim is freed from its own contractual obligations and authorized to take all reasonable self-protective measures, including suing. It is not required to twiddle its thumbs for 20 years (the maximum installment period under the MPAA, 29 U.S.C. sec. 1399(c)(1)(B), though the period here was only 14 months), while its prospects of recovering what it is owed ooze away. The point at which Central States knew that Allied was not going to meet its obligations (and also knew how much those obligations were) was reached no later than June 18 and required Central States to sue within six years of that date, which it failed to do.

Affirmed.