In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 06-3362, 06-3397, 06-4040, 07-1353

CHICAGO TRUCK DRIVERS, HELPERS
AND WAREHOUSE WORKERS UNION
(INDEPENDENT) PENSION FUND, and
JACK STEWART, Trustee,

*Plaintiffs-Appellees,*
*Cross-Appellants,*

*v.*

EL PASO CGP COMPANY, EL PASO
MIDWEST COMPANY, EL PASO
CNG COMPANY, L.L.C., AMERICAN
NATURAL RESOURCES COMPANY, and
ANR ADVANCE HOLDINGS, INC.,

*Defendants-Appellants,*
*Cross-Appellees.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 04 C 7872—**David H. Coar**, *Judge.*

———————

ARGUED SEPTEMBER 20, 2007—DECIDED MAY 13, 2008

———————

Before CUDAHY, POSNER, and WILLIAMS, *Circuit Judges.*

CUDAHY, *Circuit Judge.* The Chicago Truck Drivers,
Helpers and Warehouse Workers Union (Independent)

Pension Fund (the Fund) and its trustee, Jack Stewart, brought this suit against Defendants El Paso CGP Company, El Paso Midwest Company, El Paso CNG Company, L.L.C., American Natural Resources Company and ANR Advance Holdings, Inc. to collect withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA). *See* 29 U.S.C § 1401(b)(1). The Defendants deny that they owe any withdrawal liability. The Fund, however, argues that the Defendants are not only liable but have forfeited their right to contest liability by failing to make a timely demand for arbitration back in 1999, when a proof of claim for withdrawal liability payment was filed in the Chapter 7 bankruptcy of one of the Defendants' affiliates. The Defendants believe that their duty to arbitrate was not triggered in 1999 because the proof of claim was not the valid notice and demand for payment prescribed by the statute. The district court agreed with the Fund and granted its motion for summary judgment on liability but denied the Fund's motion for judgment on damages, choosing instead to calculate damages under another theory. Both parties appealed.

The question before us immediately is not whether the Defendants are liable for the withdrawal assessment; it is whether the Fund's filing of the proof of claim in a Chapter 7 bankruptcy constituted a statutory notice and demand and thus cut off the Defendant's right to contest liability. We hold that the proof of claim was sufficient but only because the Defendants had *actual* notice of it no later than January 1, 2002. We therefore AFFIRM the judgment of the district court on liability. We disagree, however, with the district court's resolution of the damages issues, so we VACATE the judgment on damages and REMAND the case for further proceedings.

**I.**

The MPPAA is, of course, actually a series of amendments to the Employee Retirement Income Security Act of 1974 (ERISA). *See* 29 U.S.C. § 1001 *et seq.* ERISA is famously complicated and often tedious. As is customary, we begin with a brief review of the relevant law. Hopefully, this will make the exposition of the facts a bit more digestible.

The MPPAA protects employees in multiemployer pension plans by requiring employers who withdraw from such plans to pay their share of "unfunded vested benefits." 29 U.S.C. § 1381(b)(1). This is known as "withdrawal liability." When an employer withdraws, the plan sponsor calculates the amount of liability and, "[a]s soon as practicable," notifies the employer of the liability and demands payment. 29 U.S.C. § 1399(b)(1). This "notice and demand" must include the amount of liability and a schedule of installment payments. When the employer receives the notice, it must begin paying according to the schedule. *See Robbins v. Pepsi-Cola Metro. Bottling Co.*, 800 F.2d 641, 642-43 (7th Cir. 1986) (per curiam). The statute places a premium on prompt payment; it is a "pay now, dispute later" scheme. *Id*. at 642. But the withdrawing employer "owes nothing" until the plan notifies it of its liability and demands payment. *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 423, 115 S. Ct. 981, 130 L. Ed.2d 932 (1985).

If the employer wishes to dispute a plan sponsor's assessment of withdrawal liability, it must arbitrate the issue. *See* 29 U.S.C. § 1401(a)(1). Exceptions to the arbitration requirement are made only in the rarest cases. *See Central States, Se. & Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1373 (7th Cir. 1992). Upon receipt of the notice

and demand, the employer has 90 days to request an informal review by the plan of the assessment. *See* 29 U.S.C. § 1399(b)(2)(A). The employer then has roughly 120 additional days to demand arbitration. *See* 29 U.S.C. § 1401(a)(1). If an employer fails to demand arbitration, the assessment becomes "due and owing on the schedule set forth by the plan sponsor." 29 U.S.C § 1401(b)(1).

When a plan sponsor sues to collect withdrawal liability, it may sue the withdrawing employer or any trade or business under "common control" with the employer because members of a "controlled group" are jointly and severally liable for the withdrawal. 29 U.S.C. § 1301(b)(1). The definition of a "controlled group" under the MPPAA tracks the definition under the Internal Revenue Code and includes parent-subsidiary relationships. *See* 26 U.S.C. § 1563(a). The controlled group provision allows a plan "to deal exclusively with the defaulting employer known to the fund, while at the same time assuring [itself] that legal remedies can be maintained against all related entities in the control group." *Bd. of Trs. of Trucking Employees of North Jersey Welfare Fund, INC-Pension Fund v. Kero Leasing Corp.*, 377 F.3d 288, 306 (3d Cir. 2004) (Rosenn, J., dissenting). Thus, any notice sent to one member of a controlled group is considered constructive notice to all other members of such a group. *See Slotky*, 956 F.2d at 1375.

Of course, the purpose of the MPPAA is to ensure that employers live up to the obligations they owe to the pension fund and to the employees who participate in it. But Congress also recognized that employers that have substantial pension liabilities may attempt to shirk their obligations through deceptive transactions. *See Teamsters Pension Trust Fund—Bd. of Trs. of the Western Conference*

*v. Allyn Transp. Co.*, 832 F.2d 502, 507 (9th Cir. 1987). Congress thus provided that "[i]f a principal purpose of any transaction is to evade or avoid liability under this part, [Sections 1381 to 1405] shall be applied (and liability shall be determined and collected) without regard to such transaction." 29 U.S.C. § 1392(c). This discourages companies from using corporate forms and manipulations to shield themselves from withdrawal liability.

## II.

With all this in mind, we turn to the facts of the case. The Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) (the Union) entered into a collective bargaining agreement with a trucking company called ANR Freight System, Inc. (ANR Freight) on April 3, 1994. The agreement required ANR Freight to contribute to the Fund.

ANR Freight was the wholly owned subsidiary of the Coastal Corporation (Coastal), a large oil and gas company. Coastal controlled ANR Freight through a series of intermediaries: Coastal was the sole stockholder of Coastal Natural Gas Company (Coastal Natural); Coastal Natural was the sole stockholder of ANRC; ANRC was the sole stockholder of ANRFS Holdings; and ANRFS Holdings was the sole stockholder of ANR Freight. Most of these companies subsequently changed names or were succeeded by other companies: Coastal became El Paso CGP Company; Coastal Natural became EL Paso CNG Company, L.L.C.; and ANRFS Holdings merged with El Paso Midwest Company. It is undisputed that, until November 3, 1995, these companies constituted a "controlled group," which we will call the Coastal Group.

In 1995, the Coastal Group arranged to have ANR Freight merge with Advance Transportation Company (ATC), a wholly unrelated trucking company owned by its employees and by individual shareholders. The merger was accomplished in two steps. First, on August 14, 1995, ANR Freight exchanged stock with ATC, with the result that the Coastal Group and the shareholders of ATC each became 50% owners of each other's companies. Second, on November 3, 1995, ATC merged with ANR Freight and the resulting company was immediately renamed ANR Advance Transportation Company (ANR Advance). As a result of the exchange of stock and the subsequent merger, ANR Advance was no longer part of the Coastal Group because the Coastal Group no longer owned 80% or more of ANR Advance's stock. *See United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 29, 102 S. Ct. 821, 70 L. Ed.2d 792 (1982).

Over the next three years, ANR Advance operated its trucking business and made regular contributions to the Fund. On February 2, 1999, an involuntary Chapter 11 petition was filed against ANR Advance and, on March 3, 1999, a court converted the case into a Chapter 7 proceeding. The Fund decided that ANR Advance had withdrawn from the Fund and filed a proof of claim for withdrawal liability in the ANR Advance bankruptcy on June 3, 1999. The proof of claim referred to "withdrawal liability," stated the total amount of the assessment and carried a liability payment schedule, which broke the assessment down into ten installments.

When the proof of claim was filed, the bankruptcy proceeding was under Chapter 7 and was being adminis-tered by a trustee, who apparently never informed the Defendants of the filing of the claim. The claim languished

amidst sundry paperwork for over two years. In late 2001, Steven McKemy, a lawyer for the Defendants, finally discovered it while doing due diligence in the settlement of another case. The Defendants did not, however, respond to the proof of claim. They chose to sit on their hands.

So, apparently, did the Fund, which did not follow up on the notice and did not file suit to collect the liability. On November 18, 2004, more than five years after the original proof of claim was filed in the Chapter 7 bankruptcy, the Fund sent the Defendants a letter containing a notice and demand, which the Defendants received two days later. This notice and demand contained a new schedule of ten installments, with the first due on December 1, 2004. The Defendants did not pay the first installment until February 10, 2005. The Defendants requested review of the assessment on February 15, 2005. On August 3, 2005, they demanded arbitration.

On December 6, 2004, the Fund and its trustee, Jack Stewart, brought this action to collect withdrawal liability from the Defendants. The parties then filed cross-motions for summary judgment on the question of liability. On April 18, 2006, the district court granted the Fund's motion for summary judgment and denied the Defendants' motion. Shortly thereafter, the Fund moved for summary judgment on damages. The district court denied the Fund's motion and, in a separate opinion, entered a final judgment following a different theory of damages.

### III.

We first discuss the district court's judgment on liability. Although ANR Advance severed its ties with the De-

fendants' controlled group years before it withdrew from the plan, the Fund argues that the Defendants may still be held liable because the November 3, 1995 merger was designed to "evade or avoid" withdrawal liability. *See* 29 U.S.C. § 1392(c). Evade or avoid allegations, however, are generally reserved for arbitration. *See Banner Industries, Inc. v. Central States, Se. & Sw. Areas Pension Fund*, 875 F.2d 1285, 1288 (7th Cir. 1989). Thus, the Fund argues that the Defendants have waived their right to assert their non-liability by failing to demand arbitration.

If an employer fails to demand arbitration, the assessment becomes due and owing on the schedule provided by the plan. *See* 29 U.S.C § 1401(b)(1). But the Defendants' statutory duty to arbitrate is not triggered initially until they receive a proper notice and demand. The district court thus correctly stated that, to prevail on a collection claim, the Fund must show that: (1) "the Fund was a multiemployer pension plan and the Defendants were an employer for the purposes of ERISA," (2) "the Fund notified the Defendants of their assessed liability," and (3) "Defendants failed to timely initiate arbitration." *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. El Paso CGP Co.*, No. 04 C 7872, 2006 WL 1037152, at *4 (N.D. Ill. April 17, 2006).

The Fund is, of course, a multiemployer pension plan and it is undisputed that the Defendants were once MPPAA employers.[1] This case hinges, in the first instance, on the adequacy and propriety of the June 3, 1999

---

[1] While the Defendants claim that they were no longer MPPAA employers at the time of the withdrawal, this defense needs to be raised in arbitration. *See Banner Industries*, 875 F.2d at 1288.

notice and demand because a proper notice and demand starts the arbitration clock running and thus determines whether the initiation of arbitration was timely. If the only valid notice and demand in this case is the letter sent by the Fund on November 18, 2004, then the Defendants made a timely demand for arbitration. But, if the proof of claim filed in ANR Advance's Chapter 7 bankruptcy on June 3, 1999 was a valid notice and demand, the Defendants waived their right to arbitration when this purported proof of claim was filed. The Fund would then prevail and we would need only to establish damages.

### A.

We first examine the adequacy, as statutory notice and demand, of the proof of claim filed in bankruptcy on June 3, 1999. In order to satisfy the statutory requirements, a notice and demand must include the amount of the liability, a schedule of payments and a demand for payment; it must also be sent "to the employer." 29 U.S.C. § 1399(b)(1). We have been indulgent about the specific form a notice and demand may take, and have recognized proofs of claim in bankruptcy to be adequate notices under the statute, at least in some situations. *See Slotky*, 956 F.2d at 1375; *Trs. of the Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Central Transport, Inc.*, 888 F.2d 1161, 1162 (7th Cir. 1989). In *Slotky* and *Central Transport*, we recognized proofs of claim in Chapter 11 bankruptcies as meeting the statutory requirements. Here, the Defendants contend that the proof of claim did not contain a demand for payment but we have held that a proof of claim is, by definition, a demand for payment. *Id*. The Defendants also complain that the proof of claim here did not contain a schedule, which

they interpret to mean a "timetable" rather than a "list." This is beside the point. A proof of claim filed in bankruptcy need not contain a schedule of payment; such a schedule would be useless in that context, for the bankruptcy court can ultimately set its own schedule.[2] *Slotky*, 956 F.2d at 1375.

But, as the Defendants point out, the statutory trigger for arbitration is not the mere existence of a proper notice and demand; the notice must be sent "to the employer." 29 U.S.C. § 1399(b)(1). What distinguishes the present case from *Slotky* and *Central Transport* is that the proof of claim here was filed in a *Chapter 7* bankruptcy, not a *Chapter 11* bankruptcy. In a typical Chapter 11 bankruptcy, the debtor continues to control the business as debtor-in-possession, so notice to the debtor-in-possession is, strictly speaking, notice to the employer. A Chapter 7 bankruptcy, on the other hand, is conducted by a trustee who is neither the agent of the debtor nor the fiduciary of the debtor. The trustee has no general duty to inform the debtor of the filing of a proof of claim; a duty to inform the debtor of the progress of the liquidation arises only *if the debtor so requests*. *See* 11 U.S.C. § 704(a)(7). And it is unlikely that debtors will request this information, for debtors in a Chapter 7 bankruptcy know that the remaining funds will be inadequate to meet all obligations. As a result, a proof of claim filed in a Chapter 7 bankruptcy will not foreseeably come to the attention of the employer

---

[2] When a schedule does not specify the date when the first installment is due, the first installment would presumably be due sixty days after the notice was received. *See* 29 U.S.C. § 1399(c)(2).

or to a member of the controlled group (and apparently did not here until it was later inadvertently discovered).

This is, at least, how things typically work, and the Fund has not come forward with any evidence that suggests a different situation here. Perhaps the Fund could have shown that the debtor had, in fact, been an active participant in this bankruptcy; perhaps the debtor held meetings with the trustee and kept close tabs on the proceedings. Under these circumstances, the Fund should at least be charged with showing that the filing of a proof of claim was an effective means of conveying notice, which has not been done here. Nor did the Fund notify the Defendants directly of the Chapter 7 filing. Consequently, the proof of claim filed on June 3, 1999 was an insufficient notice and demand under the statute.

**B.**

In addition, even if the present case had involved a Chapter 11 bankruptcy, we would have a serious problem of the adequacy of notice in this case. The problem arises with respect not to notice delivered directly to the employer but to notice delivered indirectly through the controlled group. The theory that notice to one member of a controlled group is notice to all is characterized as constructive notice and is generally recognized in connection with withdrawal liability. *See Slotky*, 956 F.2d at 1375; *Central Transport*, 888 F.2d at 1163-64.

When the proof of claim was filed on June 3, 1999, however, the Defendants were no longer a part of the same controlled group as ANR Advance (the subject of the proof of claim) and, hence, notice to the Defendants via the controlled group here is problematic. In essence,

the Fund asks us to extend the constructive notice principle to include notice to *former* members of the controlled group. Such an application of the constructive notice principle is unprecedented in this circuit. In the cases we have examined in which the constructive notice principle has been applied, the employer has always been a member of the then-existing controlled group. *See, e.g.*, *Central States, Se. & Sw. Areas Pension Fund v. Nitehawk Exp., Inc.*, 223 F.3d 483 (7th Cir. 2000); *Slotky*, 956 F.2d at 1375; *Central Transport*, 888 F.2d at 1163-64; *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118 (3d Cir. 1986). The Third Circuit, the only other circuit court to consider the issue, balked at such an extension of the constructive notice principle. *See Kero Leasing*, 377 F.3d at 298-99 & n.10.

Nevertheless, the Fund believes that here the district court's application of a constructive notice principle can be validated on the basis of the "evade or avoid" provision of 29 U.S.C. § 1392(c). This provision states that, if the primary purpose of a transaction is to "evade or avoid" pension liability, the transaction may be disregarded and liability enforced "without regard to such transaction." *Id*. Again, this claim is unprecedented. In the reported cases, when a fund has alleged an "evade or avoid" transaction, the issue has been not the adequacy of notice but the validity of the transaction itself or the arbitrability of that issue. *See, e.g.*, *Sherwin-Williams Co. v. New York State Teamsters Conference Pension & Ret. Fund*, 158 F.3d 387 (6th Cir. 1998); *Santa Fe Pacific Corp. v. Central States, Se. & Sw. Areas Pension Fund*, 22 F.3d 725 (7th Cir. 1994); *Doherty v. Teamsters Pension Trust Fund of Philadelphia & Vicinity*, 16 F.3d 1386 (3d Cir. 1994); *Banner Industries*, 875 F.2d at 1288. Using the "evade or avoid" provisions to

*establish* notice could have troubling consequences; those courts that have addressed the argument have thus rejected it. *See Kero Leasing*, 377 F.3d at 298-99 & n.10; *Trs. of the Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) v. Rentar Indus., Inc.*, 1989 U.S. Dist. LEXIS 13385, at **11-14 (N.D. Ill. Nov. 7, 1989).

As a practical matter, we cannot expect former owners always to be aware of a notice and demand that is sent after they have left the controlled group entirely. It is important to keep in mind that provisions like the "evade or avoid" provision reflect "congressional concern that the realities of business organizations should prevail over the formalities of corporate structure in imposing liability." *Cf. Pension Benefit Guar. Corp. v. Anthony Co.*, 537 F.Supp. 1048, 1052 n.6 (N.D. Ill. 1982). In the instant case, the Defendants retained an ownership interest in ANR Advance after the merger and loaned the company a substantial amount of money. But it is not difficult to imagine a case in which the relationship between current and former members of a controlled group is distant or, indeed, non-existent. In those cases, the practical justification for recognizing the application of a constructive notice principle loses much of its force.

We question the equity of denying a former owner the right to contest liability because it failed to respond to a notice sent to a company from which it was already separated. *See Rentar Indus.*, 1989 U.S. Dist. LEXIS 13385, at **11-14. When a plan sponsor asserts a claim against a former member of a controlled group, the best practice always is to send that notice directly to the former owner, so that it has a clear opportunity to contest liability.

## C.

Despite all these objections, the Fund's proof of claim here did eventually reach the Defendants. In fact, in their answers to the Fund's interrogatories, the Defendants admitted that their lawyer reviewed the proof of claim in question while doing due diligence in another lawsuit, and that the Defendants had "actual knowledge of the Proof of Claim no later than January 1, 2002." Appellee's App. at 275, 277. The Fund's notice thus actually got "to the employer," and the statutory duty to arbitrate was triggered when the Defendants "receive[d] the notice." 29 U.S.C. § 1399(b)(2)(A). Nothing more is required if the notice and demand contains the necessary information, as this one did.[3] Thus, this actual notice trumps any deficiencies in it as a statutory notice.

Desperate to avoid this conclusion, the Defendants now argue that "mere awareness" or "mere possession" of the proof of claim does not amount to "receipt." They also argue that they knew of the proof of claim but did not know of its content. These arguments partake of the metaphysical. The proof of claim clearly stated that it concerned withdrawal liability; the Defendants cannot stick their heads in the sand and later claim ignorance. The

---

[3] Notes written in the margins of the Defendants' copy of the proof of claim (as well as other documents) suggest that the Defendants were also aware of the potential consequences of failing to respond. The Defendants objected to the admission of these documents on the grounds of attorney-client privilege, despite the fact that these objections had already been waived in prior litigation. The Fund's motion to compel was denied as moot after the district court ruled in the Fund's favor on liability. We need not consider these matters here.

Defendants also argue that the notice should have contained some signal that it could operate "against them," but this is not the law. *See Slotky*, 956 F.2d at 1375.

The question then is simply whether the Defendants were entitled to ignore the proof of claim and wait to be sued, or whether they had to initiate arbitration. We have answered this question many times:

> Anyone who suspects that he might be adjudged a member of a controlled group and therefore subjected to withdrawal liability would be well advised to commence arbitration, so that if a court holds that he is a member of such a group and hence is subject to such liability he won't have waived the issues that are reserved for arbitration, as [the Defendant] did here.

*Id*. at 1373. Thus, the proof of claim—whatever its initial deficiencies—when it came to be inspected by an agent of the employer, operated to put the employer on notice of its withdrawal liability. The Fund was merely fortunate that its assessment of liability fell into the right hands. This stroke of luck cured the deficiencies in the Fund's conformity with the statutory requirements. The information thus communicated to the employer was adequate for statutory purposes. It also disposes of the Defendant's as-applied due process claim. The judgment entered by the district court on liability is thus affirmed.

## IV.

We now turn to the judgment on damages. The central dispute here is whether the debt based on withdrawal liability owed by the Defendants was accelerated and

became due when the Defendants became aware of their indebtedness. In its opinion on liability, the district court had stated that the Fund was entitled to accelerate the debt and cited our decision in *Central States, Se. & Sw. Areas Pension Fund v. Basic American Indus.*, 252 F.3d 911 (7th Cir. 2001). Shortly after the judgment on liability was entered, the Fund moved for an entry of summary judgment on damages and submitted a memorandum that relied heavily on our decision in *Basic American*. The Defendants filed a memorandum in opposition that advanced a different theory of damages than the one discussed in the Fund's brief. The Fund was never given an opportunity to file a reply, although it had offered to do so.

In its decision on damages, the Court distinguished *Basic American* as a case applicable only to the statute of limitations and rejected the Fund's calculation of damages. It held that the debt associated with withdrawal liability had never been accelerated and that the Defendants were required only to make installment payments according to the November 18, 2004 schedule. It thus limited the amount of interest to that accrued on past due installment payments. It did, however, award liquidated damages in the amount of 20% of the full withdrawal liability assessment plus attorney's fees.

The Fund claims that the district court entered judgment on damages without giving the it notice or an opportunity to be heard on the issue. *See R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Local Union 150, AFL-CIO*, 335 F.3d 643 (7th Cir. 2003). The Fund argues that the district court gave the impression that the calculation of damages would involve a simple application of *Basic American*. The Defendants quarrel only with the

district court's decision to base liquidated damages on the full withdrawal liability assessment rather than on only the delinquent payments. Ultimately, we believe that the case must be remanded for further proceedings on the issue of damages.

### A.

The MPPAA provides plan sponsors with a right to accelerate debt if the employer defaults. *See* 29 U.S.C. § 1399(c)(5). There are two ways to default under the statute: under § 1399(c)(5)(A), the employer can fail to make a payment when due; and, under § 1399(c)(5)(B), an event can transpire which creates a "substantial likelihood that an employer will be unable to pay its liability." 29 U.S.C. § 1399(c)(5). Before an employer can be held to have defaulted on a missed payment, there must be notice and a sixty-day opportunity to cure. *See* 29 U.S.C. § 1399(c)(5)(A). Acceleration under the statute is permissive, not mandatory. *See Chicago Truck Drivers, Helpers & Warehouse Union (Indep.) Pension Fund v. Century Motor Freight.*, 125 F.3d 526, 533 (7th Cir. 1997). This permissive feature reflects the fact that acceleration might not be in the plan's best interests. *Cf. Bd. of Trs. of Dist. No. 15 Machinists' Pension Fund v. Kahle Eng'n Corp.*, 43 F.3d 852, 859 & n.7 (3d Cir. 1994). Relying on our decision in *Basic American*, however, the Fund argues that acceleration occurred automatically on July 3, 1999 or, at the latest, on April 1, 2002, despite its failure to satisfy any of the statutory requirements applying to notice of acceleration. *See* 29 U.S.C. § 1399(c)(5).

We agree with the district court that *Basic American* is distinguishable from the case at hand. *Basic American*

was a case in which we decided at what point in time a claim for withdrawal liability first accrued for purposes of the statute of limitations. In order to determine that time, we had to determine the earliest possible moment at which the claim *could* have been brought. *See Basic American*, 252 F.3d at 915. Relying on principles of contract law, we found that the Fund could have brought a claim when the employer repudiated its withdrawal liability by ceasing operations and filing for bankruptcy. *Id*. at 918. Because that repudiation took place more than six years before the Fund brought suit, we held that the suit was barred. Given the nature of our inquiry, whether the plan sponsor in that case effectively exercised its right to accelerate under the statute was not relevant, and we have never applied *Basic American* outside of the statute of limitations context, which was applicable to that case. We did not purport in *Basic American* to find there a general principle of automatic acceleration of withdrawal debt. Thus, *Basic American* did not hold that the filing of a proof of claim in bankruptcy automatically accelerated a debt under the MPPAA. In fact, *Basic American* explicitly stated otherwise. *Id*. at 916 ("Filing for bankruptcy . . . is not anticipatory repudiation per se."). This makes sense within the statutory scheme, where the decision to exercise the right of acceleration is left to the Fund and the employer is given a statutory right to cure. *See* 29 U.S.C. § 1399(c)(5). The filing of a proof of claim does not absolve the Fund of its responsibility to comply with the statutory requirement of serving notice on the employer before accelerating the debt.[4] Nor is there any basis for the

---

[4] Further, if the Fund had intended to accelerate the debt, why did it send a second notice and demand years later with an

(continued...)

Fund to argue that the debt was accelerated on June 3, 1999, years before the Defendants ever actually received the notice and demand.

The fact that we agree with the district court's reasoning, however, does not resolve the issue of damages because the district court granted summary judgment on grounds very different from those presented in the Fund's motion. In fact, the court ruled on the statutory acceleration issue without warning the Fund that it intended to do so. The Fund assumed that its summary judgment motion on its damage calculation would involve an application of *Basic American*. It is inconsequential that the Fund itself sought summary judgment, the question is whether the Fund was "fairly apprised of the ultimate basis for the district court's reasoning." *R.J. Corman*, 335 F.3d at 650. Of course, the district court may enter judgment on a ground not contained in the motion "if the parties have had an adequate opportunity to argue and present evidence on that point and summary judgment is otherwise appropriate." 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2719 (3d ed. 1998); *accord Brock v. Carroll*, 107 F.3d 241, 247 (4th Cir. 1997) (Phillips, J., concurring and dissenting); *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 777-78 (Fed. Cir. 1995).

We think that summary judgment was inappropriate in this case. The Fund was clearly surprised, for it had relied

---

[4] (...continued)
entirely new, superceding schedule? While that notice did purport to "reserve" the Fund's rights, it is troubling that the Fund would send what appear to be alternative or inconsistent demands for payment.

on *Basic American* throughout the litigation and the reference to *Basic American* in the district court's opinion on liability signaled to the Fund that it would prevail on that theory.[5] The Fund was thus under the impression that it was entitled to accelerate under the theory enunciated in *Basic American*. That is why the Fund addresses only *Basic American* in its motion and its supporting memorandum (statutory requirements for acceleration were mentioned but only for purposes of contrast). The Defendants, of course, try to argue that this omission operates as a waiver. We think the Fund's silence on this issue is evidence of lack of notice and surprise, not waiver. *See R.J. Corman*, 335 F.3d at 648.

We also think that the Fund was disadvantaged. Obviously, it was not put on notice that it might argue an entitlement to accelerate the debt under § 1399(c)(5)(A). What is worse, the Fund was twice denied the opportunity to introduce additional evidence—once when its oral proffer was denied, and again when its motion to supplement the record was denied. The Fund's potential evidence included a supplemental declaration by an employee of the Fund, Phyllis Gabriel, who stated that bankruptcy is an event under plan rules that indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability. This evidence

---

[5] The Fund's complaint had two counts. Count I was an action for the full amount of withdrawal liability, while Count II was an action for interim installment payments. In the opinion on liability, the district court ruled in favor of the Fund on Count I. The opinion on damages, however, seems to reflect a Count II award rather than a Count I award. Thus, there seems to be some tension in the decision.

might have supported an argument for acceleration under § 1399(c)(5)(B), a possibility that the district court apparently never considered and which the Fund never had an opportunity to fully present. Had it been able at least to file a reply brief, the Fund could have alerted the district judge to these potential bases for statutory acceleration. Under the present circumstances, we believe that the district court should not have granted summary judgment on damages before giving the Fund an opportunity to present its statutory argument. The judgment on damages is thus vacated and the case remanded for consideration of acceleration under the statute, including an opportunity for the Fund to present its views on that issue. The district court's decision on acceleration is therefore vacated and remanded for further proceedings.

## B.

The district court awarded liquidated damages based on the entire withdrawal liability assessment, including payments that, under the district court's decision, were not yet due. The liquidated damages issue raised by the Defendants thus depends on a resolution of the acceleration issue.[6]

An action for withdrawal liability under the MPPAA is treated as an action for delinquent contributions under ERISA. ERISA permits 20% of any delinquent contribution to be charged to a defendant as liquidated damages, *see* 29 U.S.C. § 1132(g)(C)(ii). This is the penalty that the

---

[6] The attorney's fees issue can also wait until the resolution of these issues.

employer pays for forcing a plan sponsor to litigate. *See Central States, Se. & Sw. Areas Pension Fund v. Lady Baltimore Foods, Inc.*, 960 F.2d 1339, 1342 (7th Cir. 1992). But a contribution is delinquent only if the "employer fails to make timely payment." 29 U.S.C. § 1401(d). Thus, we have held that liquidated damages should be due only on delinquent payments, not on the portions of the withdrawal liability that have not yet come due. *See Century Motor Freight*, 125 F.3d at 535. We think the district court was inconsistent in finding that there had been no acceleration and yet imposing liquidated damages on the entire withdrawal liability assessment. On remand, the district court may first determine whether the debt was ever accelerated and, if so, when acceleration occurred. Liquidated damages may then be assessed on the delinquent portion of the assessment.

### C.

The final question before us is whether the Defendants' interim payments should have been applied first to the principal or to the accrued interest. It is the practice of the Fund to apply payments first to accrued interest; this practice comports with the federal common-law rule known as the United States Rule. *See Story v. Livingston*, 38 U.S. (13 Pet.) 359, 371 (1839). The rule that payment is first applied to accrued interest "applies in the absence of 'a clearly expressed intention' by the parties to allocate payments in some other way," and it "does not permit the debtor unilaterally to allocate payments to principal rather than interest." *S. Natural Gas Co. v. Pursue Energy*, 781 F.2d 1079, 1088 n.11 (5th Cir. 1986) (citations omitted). Because the parties did not specify otherwise in this case, the Rule would appear to apply.

The district court held, however, that the common-law rule contradicted federal regulations stating that interest on overdue withdrawal liability should be paid only from the "due date" until the "date paid." 29 C.F.R. § 4219.32(a)(1). The regulations specify that the "date paid" is deemed to be the "date on which [the payment of withdrawal liability] is received." 29 C.F.R. § 4219.32(d). The district court stressed that the Fund had "received" several quarterly installment payments (albeit late payments) from the Defendants. Those quarterly installments had, according to the district court, thus been "paid" and no further interest could be charged on them.

The district court apparently assumed that the payments were earmarked for the principal. This, however, begs the question. In order to determine when the payment was "received," we need to know how the payment is applied. If the payment received by the Fund is not applied to the principal but instead applied to the accrued interest, then a portion of the principal was never "paid" and interest continues to accrue on that unpaid portion.[7] We see no contradiction between the federal common-law rule and the regulations. Indeed, the United States Rule was intended to fill this kind of interstitial gap and we believe that it should be applied here. The statute should be broadly construed to effectuate its remedial purposes,

---

[7] For example, assume that an employer was obligated to make a $1,000 installment payment to a pension fund on a certain date but sent the $1,000 a month later, after $100 of interest had already accrued. If the fund has a practice of paying the accrued interest first, then the fund has only really "received" $900 toward the installment payment because $100 was applied to the interest.

which are to protect plan participants and the solvency of pension funds. *See Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 123 (4th Cir. 1991). The common-law rule encourages employers to pay the balance in full, and this comports with the remedial goals of the statute.

## V.

We AFFIRM the judgment of the district court on liability but VACATE the judgment on damages and REMAND the case for further proceedings.