In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1618

JAMES TSAREFF, *et al.*,

*Plaintiffs-Appellants,*

*v.*

MANWEB SERVICES, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:10-cv-00980-SEB-DKL — **Sarah Evans Barker**, *Judge.*

ARGUED SEPTEMBER 19, 2014 — DECIDED JULY 27, 2015

Before BAUER, ROVNER, and WILLIAMS, *Circuit Judges.*

BAUER, *Circuit Judge.* Plaintiff-appellant, Indiana Electrical
Pension Benefit Plan ("Plan"), through its trustee, James
Tsareff, brings this action to collect withdrawal liability from
defendant-appellee, ManWeb Services, Inc. ("ManWeb"), un-
der the Employee Retirement Income Security Act ("ERISA"),
as amended by the Multiemployer Pension Plan Amendments
Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1001–1461. The Plan
argues that ManWeb is responsible for the withdrawal liability

incurred by Tiernan & Hoover, certain assets of which ManWeb acquired through an asset sale, under a theory of successor liability. The Plan appeals the district court's grant of judgment as a matter of law to ManWeb and denial of the Plan's motion for summary judgment. For the reasons that follow, we reverse.

## I. BACKGROUND

ManWeb is an Indianapolis-based company that performs engineering, construction, and installation-related services. In August 2009, ManWeb entered into an asset purchase agreement ("APA") with Tiernan & Hoover, another Indianapolis-based electrical contractor that performed engineering, construction, and service for cold storage facilities under the trade name, "The Freije Company." Unlike ManWeb, a non-union employer, Tiernan & Hoover was party to a collective bargaining agreement ("CBA") with IBEW Local 481 Union ("Union"), in accordance with which it made contributions to the Plan, a multiemployer pension fund. As a result of the asset purchase, Tiernan & Hoover ceased operations and no longer had an obligation to contribute to the Plan. Although ManWeb continued to do the same type of work in the jurisdiction of the CBA for which contributions were previously required of Tiernan & Hoover, ManWeb did not make any contributions to the Plan following its purchase of Tiernan & Hoover's assets.

On February 24, 2010, counsel for the Plan sent a letter addressed to "The Freije Company" to Tiernan & Hoover's former Indianapolis address, indicating that it had determined that the company had effectuated a complete withdrawal from the Plan in August 2009 and that, pursuant to § 4202 of ERISA,

the Plan had assessed withdrawal liability against Tiernan & Hoover. The letter indicated that Tiernan & Hoover owed $661,978.00 in withdrawal liability, which could be satisfied in one lump sum payment or in nineteen quarterly payments, commencing within sixty days of the company's receipt of the letter. Pursuant to a mail forwarding instruction, the letter was forwarded to ManWeb's address at 9211 Castlegate Drive, Indianapolis, Indiana 46256, where it was received and signed for by a ManWeb employee. Nevertheless, no payments were ever made to satisfy this liability; further, Tiernan & Hoover never sought review of the withdrawal liability assessment or initiated arbitration, despite the availability of both options under the statute. 29 U.S.C. §§ 1399(b)(2)(A) and 1401(a)(1). Pursuant to the statute, the assessment against Tiernan & Hoover became due and owing after its failure to request review and initiate arbitration within the statutory deadline. 29 U.S.C. § 1401(b)(1).

As a result of Tiernan & Hoover's failure to make withdrawal payments, the Plan filed a collection action in federal court against Tiernan & Hoover pursuant to 29 U.S.C. §§ 1132(e) and (f), and 1451(c). The Plan added ManWeb as a defendant under a theory of successor liability. At the close of discovery, the parties filed cross-motions for summary judgment. The district court granted the Plan's motion in part, finding that Tiernan & Hoover had waived its right to dispute the assessment of withdrawal liability by failing to initiate arbitration proceedings and, therefore, owed the full amount of the assessment. However, with respect to the Plan's claim of successor liability against ManWeb, the district court held that

ManWeb was not liable to the Plan and granted ManWeb's
motion for judgment as a matter of law. This appeal followed.

## II. ANALYSIS

The Plan argues on appeal that the district court erred in
granting ManWeb judgment as a matter of law and denying
the Plan's motion for summary judgment. We review this
decision *de novo*. *McDougall v. Pioneer Ranch Ltd. P'ship*, 494
F.3d 571, 575 (7th Cir. 2007). Summary judgment is proper only
when the record demonstrates that there is no genuine issue as
to any material fact and the moving party is entitled to a
judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp.
v. Catrett*, 477 U.S. 317, 322 (1986). Where, as here, the district
court was faced with cross-motions for summary judgment,
our review requires that we construe all facts and inferences in
favor of the party against whom the motion under consider-
ation was made—in this case, the Plan. *Hendricks-Robinson v.
Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998). Before we proceed,
however, we must address the district court's interpretation of
the federal successor liability notice requirement.

### A. Notice of Contingent Withdrawal Liability Satisfies the Successor Liability Notice Requirement

The district court held that the successor liability notice
requirement excludes pre-acquisition notice of contingent
liabilities; thus, because the Plan did not assess the amount of
Tiernan & Hoover's withdrawal liability until after the asset
purchase, it was impossible for ManWeb to have notice of any
existing withdrawal liability prior to acquisition. The Plan
argues that, in the narrow context of multiemployer pension
fund withdrawal liability, the successor liability notice element

encompasses both existing and contingent liabilities. Accordingly, the Plan maintains that the notice requirement is satisfied because the record shows that ManWeb had notice of Tiernan & Hoover's potential withdrawal liability. Because this issue calls for an examination of the correct legal notice standard for successor liability in the employer withdrawal liability context, we review it *de novo*.

The successorship doctrine under federal common law has developed extensively over the years in an effort to protect federal rights and effectuate federal policies. *See Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.,* 59 F.3d 48 (7th Cir. 1995); *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac,* 920 F.2d 1323 (7th Cir. 1990). The general common law rule of successor liability holds that, except for certain exceptions, where one company sells its assets to another company, the latter is not liable for the debts and liabilities of the seller. *See Travis v. Harris Corp.,* 565 F.2d 443, 446 (7th Cir. 1977). However, "the Supreme Court and this Circuit have imposed liability upon successors beyond the bounds of the common law rule in a number of different employment-related contexts," *Artistic Furniture,* 920 F.2d at 1326, when "(1) the successor had notice of the claim before the acquisition; and (2) there was 'substantial continuity in the operation of the business before and after the sale,'" *Tasemkin,* 59 F.3d at 49 (quoting *E.E.O.C. v. G-K-G, Inc.,* 39 F.3d 740, 748 (7th Cir. 1994)). *See, e.g., Golden State Bottling Co., Inc. v. N.L.R.B.,* 414 U.S. 168 (1973); *Artistic Furniture,* 920 F.2d at 1329; *E.E.O.C. v. Vucitech,* 842 F.2d 936 (7th Cir. 1988); *Wheeler v. Snyder Buick, Inc.,* 794 F.2d 1228 (7th Cir. 1986). Successor liability is an equitable doctrine,

*Tasemkin,* 59 F.3d at 49, and in every instance where we have found the imposition of federal successor liability to be appropriate, we have done so after carefully balancing the need to vindicate important federal statutory policies with equitable considerations. Thus, determining whether or not notice of a contingent liability satisfies the successorship notice requirement in the context of employer withdrawal liability necessitates a similar analysis of the underlying policy goals.

The MPPAA consists of a series of amendments to ERISA aimed at minimizing "the adverse consequences that resulted when individual employers terminate[d] their participation in, or withdr[e]w from, multiemployer plans." *Pension Benefit Guarantee Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 722 (1984). *See also Chicago Truck Drivers v. El Paso CGP Co.,* 525 F.3d 591, 595 (7th Cir. 2008); *Artistic Furniture,* 920 F.2d at 1328. To this end, the MPPAA requires employers who withdraw from multi-employer pension plans to pay their share of "unfunded vested benefits," or withdrawal liability. *See* 29 U.S.C. § 1381(b)(1). By enacting provisions that hold withdrawing employers liable for their share of their plan's unfunded vested pension benefits, Congress evinced a desire to (1) "relieve the financial burden placed upon remaining contributors to a multiemployer fund when one or more of them withdraws from the plan," *Artistic Furniture,* 920 F.2d at 1328; (2) "avoid creating a severe disin-centive to new employers entering the plan," House Commit-tee on Ways and Means, *Multiemployer Pension Plan Amend-ments Act of 1980*, H.R. Rep. No. 96-869, Part I, at 67, reprinted in 1980 U.S. Code Cong. & Admin. News 2918, 2935 (herein-after "House Report"); and (3) prevent the creation of funding

deficiencies, House Report, Part II, at 15, reprinted in 1980 U.S. Code Cong. & Admin. News 2993, 3004.

Imposing successor liability for unpaid multiemployer pension fund contributions and withdrawal liability effectuates these congressional policies and goals. *See Tasemkin*, 59 F.3d at 49; *Artistic Furniture,* 920 F.2d at 1329; *Central States, Se. & Sw. Areas Pension Fund v. Hayes,* 789 F. Supp. 1430, 1435–1436 (N.D. Ill. 1992) (relying on *Artistic Furniture*'s analysis in holding successor liable for predecessor's delinquent withdrawal liability). However, although contribution liability and withdrawal liability are animated by similar congressional motives, there is an important distinction between the two that is relevant to our analysis. While contribution costs are calculated per the terms of an existing collective bargaining agreement to which an employer is party, withdrawal liability cannot be assessed until the plan sponsors have determined that the employer has withdrawn under the statute. The MPPAA provides that when an employer withdraws from a multiemployer plan, the plan sponsor calculates the amount of liability owed by the employer and, as soon as practicable, notifies the employer of the amount due and demands payment. 29 U.S.C. § 1382. Consequently, unlike contribution costs, "the withdrawing employer cannot determine, or pay, the amount of its debt until the plan has calculated that amount … ." *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.,* 513 U.S. 414, 423 (1995).

Because the assessment of withdrawal liability is triggered by an employer's withdrawal from a multiemployer plan, whether or not the precise amount of withdrawal liability is

ascertainable prior to the employer's asset sale depends on whether withdrawal occurs before or after the asset sale takes place. The precise amount of withdrawal liability is not ascertainable pre-acquisition if, as here, the employer is found to have withdrawn *after* it has sold its assets. However, if the employer withdraws from the plan before selling its assets (*e.g.*, ceases operations due to bankruptcy) and the plan assesses withdrawal liability in the interim period between the withdrawal and subsequent asset sale, the precise amount of withdrawal liability may be known prior to the asset sale. *See, e.g., McDougall*, 494 F.3d at 571; *Tasemkin*, 59 F.3d at 48. Consequently, were the successor liability notice requirement to exclude notice of contingent liabilities in this narrow context—as the district court held below, and as ManWeb argues here—a liability loophole would exist: multiemployer plan sponsors would be foreclosed in some situations (but not others) from seeking withdrawal liability from asset purchasers who would otherwise qualify as successors, and the plans would be left "holding the bag," *Central States, Se. & Sw. Areas Pension Fund v. Nitehawk Express, Inc.*, 223 F.3d 483, 487 (7th Cir. 2000).

We do not believe that this result would further Congress's goal of ensuring that the responsibility for a withdrawing employer's share of unfunded vested pension benefits is not shifted to remaining employers. *See Central States, Se. & Sw. Pension Fund v. Bomar Nat'l, Inc.*, 253 F.3d 1011, 1014 (7th Cir. 2001). Nor do we believe that notice of contingent withdrawal liability is inconsistent with this court's opinion in *Artistic Furniture*, which, contrary to what ManWeb argues, did not hold that successor liability arises *only* when the purported

successor "knows the precise extent" of the liability.[1] *Artistic Furniture* requires that we strike a balance between the need to effectuate federal labor policies with "the social interest in facilitating the market in [the transfer of] corporate and other productive assets." *Artistic Furniture,* 920 F.2d at 1325. Surely it would be inequitable "to impose successor liability on an innocent purchaser when … the successor did not have the opportunity to protect itself by an indemnification clause in the acquisition agreement or a lower purchase price." *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750 (7th Cir. 1985). However, such measures are still available in an asset sale where the buyer has notice that the seller may be contingently liable for withdrawal liability. For these reasons, we disagree with the district court and hold that notice of contingent withdrawal liability satisfies the successor liability notice requirement.

---

[1]  ManWeb cherry-picks this language, which originally appeared in this court's opinion in *Vucitech*, 842 F.2d at 945, twisting the court's holding and ignoring the context in which that language appears. In *Vucitech*, the court noted that, where a successor "knows about its predecessor's liability, knows the precise extent of that liability, and knows that the predecessor itself would not be able to pay a judgment against it, the *presumption* should be in favor of successor liability." *Id.* at 945 (emphasis added). However, the court did not hold that the notice element *requires* the existence of a precise debt. In fact, just the opposite, as *Vucitech* imposed successor liability on an asset purchaser where a number of employment discrimination suits had been filed against the predecessor prior to acquisition, but where the court had not yet determined the precise extent of the liability stemming from those suits. *Id.* at 946.

**B.  ManWeb Had Notice of Tiernan & Hoover's With-
drawal Liability**

Applying this rule to the present case, it is clear that
ManWeb had notice of Tiernan & Hoover's contingent with-
drawal liability. "Notice can be proven not only by pointing to
the facts that conclusively demonstrate actual knowledge, but
also by presenting evidence that allows the fact finder to imply
knowledge from the circumstances." *Artistic Furniture,* 920 F.2d
at 1329. Here, ManWeb's notice of Tiernan & Hoover's contin-
gent withdrawal liability can be both reasonably inferred and
directly proven by evidence in the record.

To begin with, prior to finalizing the purchase of Tiernan &
Hoover's assets, ManWeb conducted pre-purchase negotia-
tions and performed the due diligence necessary to evaluate
the asset sale. Going into this process, ManWeb's owners,
Charles Mandrell and Michael Webster, were aware that
Tiernan & Hoover was a union-affiliated employer. At the due
diligence stage, Webster testified that he conducted an analysis
of Tiernan & Hoover's union-related obligations to make sure
that the company was current on their payroll and fees to
the union. He also discussed unfunded pension liabilities
with the President of Tiernan & Hoover, Mick Hoover, because
he "knew that the pension was short of money." Mandrell,
who was also involved in the decision-making process related
to the asset purchase of Tiernan & Hoover, also had concerns
going into the purchase negotiations because he knew "the
risk associated with dealing with the unions." Mandrell had
previously worked for a union contractor and testified that he
was "very aware" of the concept of withdrawal liability prior
to the asset sale; the asset sale was "not a transaction that

[he] specifically wanted to do" because he "under[stood] the underfunded portion of the pension fund" and knew of the associated risk of "potential liability." Together, this demonstrates that ManWeb's key decision-makers were aware of Tiernan & Hoover's union obligations and shared concerns related to unfunded pension plan liabilities.

Additionally, Tiernan & Hoover's contingent withdrawal liability was explicitly included in the APA, which was signed by Webster on behalf of ManWeb, through reference to and attachment of Tiernan & Hoover's financial statements and balance sheets for the years 2006 and 2007. These documents, which were turned over to ManWeb as part of ManWeb's pre-purchase due diligence, expressly stated that Tiernan & Hoover "contributes to various multi-employer, union-sponsored pension plans" and that, as such, Tiernan & Hoover was subject to certain liabilities imposed by ERISA and the MPPAA, including "*the share of the [P]lan's unfunded vested liabilities allocable to [Tiernan & Hoover] upon withdrawal* from the union or termination of the plan for which [Tiernan & Hoover] may be contingently liable" (emphasis added). The APA also included an "Excluded Liabilities" clause, which provided that ManWeb was not obligated to assume and did not agree to assume any liability or obligation "arising out of or related to union related activities, including without limitation pension obligations," or "under any Benefit Plan" (a term that is defined later in the agreement to include each "Pension Plan and Multiemployer Plan of Seller"). These sections of the APA, coupled with Webster and Mandrell's knowledge of unfunded pension liabilities, establish that ManWeb had sufficient pre-acquisition notice of Tiernan & Hoover's contingent with-

drawal liability to satisfy the federal successor liability notice requirement.

### C. Imposing Successor Liability on ManWeb is Equitable

As we previously noted, "successor liability is an equitable doctrine, not an inflexible command, and 'in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate.'" *Tasemkin*, 59 F.3d at 49 (quoting *Howard Johnson Co., Inc. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249, 256 (1974)). The district court held that, even if notice of a contingent liability satisfied the notice requirement for successor liability, imposing such a liability on ManWeb would be inequitable. We review the district court's determination to grant equitable remedies for abuse of discretion. *E.E.O.C. v. Northern Star Hospitality, Inc.*, 777 F.3d 898, 901 (7th Cir. 2015). However, as always, an error of law is necessarily an abuse of discretion. *Estate of Enoch ex rel. Enoch v. Tienor*, 570 F.3d 821, 822 (7th Cir. 2009).

First, a brief overview of the MPPAA's mandates is necessary. Under the MPPAA, "any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 4201 through 4219 [29 U.S.C. §§ 1391–1399] shall be resolved through arbitration." 29 U.S.C. § 1401(a)(1). Failure to initiate arbitration has a simple and adverse consequence—withdrawal is conclusively established and the amount demanded by the pension

plan becomes due and owing. *Id.* at (b)(1); *Robbins v. Admiral Merchants Motor Freight, Inc.*, 846 F.2d 1054, 1056 (7th Cir. 1988). "The result is harsh," *Robbins*, 846 F.2d at 1057, but it effectuates Congress's intent to ensure the stability of pension funds.

The district court held—and the parties to this appeal do not dispute—that Tiernan & Hoover, by failing to arbitrate the assessment of its withdrawal liability, waived any merits-based defense that may have been available. However, the court concluded that if Tiernan & Hoover's waiver was the only basis upon which it was liable for withdrawal, the Plan would have to establish that ManWeb had notice of the events that led to Tiernan & Hoover's waiver before the asset purchase. The district court then determined that this would be impossible (since Tiernan & Hoover was notified of its withdrawal liability several months after the closing of the APA); consequently, the court turned to an evaluation of Tiernan & Hoover's underlying withdrawal. Ultimately, the district court held that Tiernan & Hoover did not effectuate a withdrawal under the MPPAA and that, as a result, it would be inequitable to hold ManWeb liable as a successor for Tiernan & Hoover's withdrawal liability.

We address the district court's two determinations in turn. First, the district court erred as a matter of law in concluding that, because Tiernan & Hoover waived any merits-based defense by failing to arbitrate, the Plan had to establish that ManWeb had notice that Tiernan & Hoover failed to arbitrate. This, quite simply, is not required by the successor liability notice requirement and does not find support in the policies underlying the imposition of successor liability in the context of the MPPAA. *See supra*, Part II.A. The notice requirement is

animated by concerns that it is inequitable to impose successor liability upon an innocent purchaser who did not have an opportunity to protect itself by obtaining indemnification or negotiating a lower purchase price. *See Musikiwamba*, 760 F.2d at 750. Thus, the successor's remedy for successor liability is already in place.

Furthermore, while the district court was within its discretion to evaluate whether, under the facts presented in this case, it would be equitable to impose liability on ManWeb when its predecessor waived arbitration, it abused this discretion by ignoring the fact that ManWeb could and did protect itself against liability. To begin with, ManWeb obtained indemnification "from, against and in respect of any and all losses, liabilities … and expenses whatsoever … that may be incurred by [Tiernan & Hoover] from or by reason of … any inaccuracy or representation or breach of warranty made by [Tiernan & Hoover] in this Agreement … [and] the Excluded Liabilities." Further, ManWeb, having knowledge of Tiernan & Hoover's potential withdrawal liability, could have required Tiernan & Hoover to obtain an estimate of their withdrawal liability, *see* 29 U.S.C. § 1021(l) (providing that employers have the right to annually request an estimate of their potential withdrawal liability), in order to negotiate a lower purchase price. Shielding a successor employer from liability when the company had knowledge of the potential liability and still had bargaining power with regard to the transaction runs counter to the policies underlying the doctrine of successor liability. *See Golden State,* 414 U.S. at 185. *See also Einhorn v. M.L. Ruberton Const. Co.,* 632 F.3d 89, 96 (9th Cir. 2011) ("The requirement of notice and the ability of the successor to shield itself during

negotiations temper concerns that imposing successor liability might discourage corporate transactions."). Accordingly, the district court abused its discretion in this respect.

Finally we turn to the district court's analysis of Tiernan & Hoover's underlying liability. The Plan argues that the question of whether or not Tiernan & Hoover withdrew under the statute was a question reserved for the arbitrator and, since Tiernan & Hoover's withdrawal was conclusively established once it waived arbitration, the merits of this determination were removed from the district court's purview and should not have been reviewed. We agree. The statute is clear: "any dispute over withdrawal liability *shall* be arbitrated." *Robbins*, 846 F.2d at 1056 (quoting *I.A.M. Nat'l Pension Fund v. Clinton Engines Corp.*, 825 F.2d 415, 417 (D.C. Cir. 1987)). Arbitration is treated as an administrative remedy exhaustion requirement and courts interpreting § 1401(a)(1) have been consistent in their conclusion that "'[a]rbitrate first' is indeed a rule Congress stated unequivocally." *Robbins*, 846 F.2d at 1056. The result may be harsh, but "the statute embodies a strong public policy that any dispute [over withdrawal liability] be submitted to arbitration." *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Louis Zahn Drug Co.*, 890 F.2d 1405, 1410 (7th Cir. 1989). In short, "[a]rbitration reigns supreme under the MPPAA," *Clinton Engines*, 825 F.2d at 422, thus the district court's substantive review of Tiernan & Hoover's underlying withdrawal liability constitutes an error of law, and by definition, an abuse of discretion.

### III. CONCLUSION

For the aforementioned reasons, the district court's grant of judgment as a matter of law to ManWeb and denial of summary judgment to the Plan is reversed. Since the district court did not address the successor liability continuity requirement, this case is remanded to the district court for further proceedings consistent with this opinion.