In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-1980

MARK MCCLESKEY, *et al.*,

*Plaintiffs-Appellants*,

*v.*

CWG PLASTERING, LLC,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:15-cv-01284 — **Larry J. McKinney**, *Judge*.

ARGUED DECEMBER 6, 2017 — DECIDED JULY 31, 2018

Before WOOD, *Chief Judge*, and EASTERBROOK and
HAMILTON, *Circuit Judges*.

WOOD, *Chief Judge*. Walter "Wally" Gianino owned and
operated a plastering company in St. Louis, Missouri, for over
thirty years. That business—Gianino Plastering—abruptly
closed in 2012. Around the same time, Wally's son, Curt Gia-
nino, who had worked at Gianino Plastering for over a dec-
ade, founded his own company, CWG Plastering, LLC. CWG
took on at least some of Gianino Plastering's customers, hired

its employees, and without missing a beat completed jobs that Gianino Plastering had begun. What might be a story of a son following in his father's footsteps is complicated by an inconvenient fact: Curt went into business on the same day that a $196,940.73 judgment was entered against his father's company.

That judgment arose out of Gianino Plastering's 2009 collective bargaining agreement with the Operative Plasterers and Cement Masons International Association Local 3 ("the Union"). The agreement obligated the company to make regular contributions to the Indiana State Council of Plasterers and Cement Masons Health and Welfare and Pension Funds ("the Funds"). Gianino Plastering soon fell short of meeting that obligation, prompting the Funds to sue in the Southern District of Indiana in 2011 to recover the delinquent payments. After a bench trial, the district court entered judgment against Gianino Plastering and in favor of the Funds. But the Funds were blocked from collecting on their judgment because Gianino Plastering filed for bankruptcy.

The Funds now have sued CWG, asserting that CWG is Gianino Plastering's successor and alter ego and thus liable for both the judgment and for other ongoing violations of the collective bargaining agreement. After discovery, the parties filed cross-motions for summary judgment. The district court ruled that the Funds had not produced enough evidence to proceed to trial. Our *de novo* review of the record convinces us to the contrary: the Funds proffered considerable evidence that a trier of fact could use to support its case against CWG, and so we reverse and remand.

**I**

The Funds rely on two legal theories to impose liability on CWG for Gianino Plastering's debts and continuing obligations. First, they contend that CWG is a successor to Gianino Plastering, making it liable for Gianino Plastering's failure to pay into the Funds. See, *e.g.*, *Teed v. Thomas & Betts Power Sols., L.L.C.*, 711 F.3d 763, 764 (7th Cir. 2013). Second, they argue that CWG must continue to abide by Gianino Plastering's collective bargaining obligations as an alter ego of the defunct company. See, *e.g.*, *Int'l Union of Operating Eng'rs, Local 150, AFL-CIO v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312–13 (7th Cir. 1987).

Because CWG's liability arises under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1132, 1145, and the National Labor Relations Act (NLRA), 29 U.S.C. § 185(a), everyone assumed in the district court that federal law governs both claims. (On appeal, CWG cited a few cases that rested on state law, but it never actually argued that state law applies.) At oral argument, CWG belatedly took the position that state law should apply. Choice of law is not a subject of jurisdictional status, and so a party can forfeit that issue by overlooking it. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014). That is what CWG did here: it failed to challenge the governing law either in its briefs before this court or in its summary judgment materials in the district court. We thus consider the subject forfeited, see *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012).

**A**

Even with the forfeiture, the question remains whether we should, on our own initiative, reject the use of federal law in

favor of one or more state laws. We see no reason to do so here. If the choice of federal law appeared to be flatly inconsistent with the Supreme Court's decisions, we would have a different problem. But it is not. To the contrary, the NLRA and ERISA are both statutes in which the Supreme Court has often opted for a federal standard, in light of the broad preemptive force of both ERISA and section 301 of the Labor Management Relations Act. See *Smith v. Evening News Ass'n*, 371 U.S. 195, 200 (1962); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 55–56 (1987).

For example, the Supreme Court announced a federal standard for successor liability in a number of cases beginning with *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543 (1964), where it addressed the question whether a corporate successor had a duty to arbitrate under the labor laws. *Id.* at 548–49. There the Court found that federal law controlled and imposed a duty to arbitrate on the successor employer, even though only the predecessor had actually agreed to arbitrate. *Id.* at 550–51. Over the next decade, the Court periodically returned to successor liability under the NLRA and in each instance, it used a federal standard. See *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 174–85 (1973) (finding that federal labor policy favored holding a successor liable for the unlawful discharge of an employee from its predecessor); *NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 287–88 (1972) (holding that a successor is not bound to substantive terms of previous collective bargaining agreement). See also *Howard Johnson Co. v. Detroit Local Joint Exec. Bd., Hotel & Rest. Emps. & Bartenders Int'l Union, AFL-CIO*, 417 U.S. 249, 264–65 (1974) (no successor liability).

A federal standard for alter-ego liability also has deep roots in labor law. In *Howard Johnson*, the Supreme Court held, without even a nod to state law, that federal common law governed the question before it. It then went on to state that under federal law, an "alter ego" (unlike a successor corporation) "is in reality the same employer and is subject to all the legal and contractual obligations of the predecessor." 417 U.S. at 259 n.5.

On the other side of the ledger we have the Supreme Court's decision in *Peacock v. Thomas*, 516 U.S. 349 (1996), which cautions federal courts not to jump to the assumption that federal common law applies. *Peacock* started out as an ERISA suit by a class against a company (Tru-Tech) and one of its shareholder-officers (Peacock). That suit resulted in a judgment against Tru-Tech, but not against Peacock. After the court of appeals affirmed the judgment, the named class representative, Thomas, sued Peacock to try to collect the judgment against Tru-Tech. The Supreme Court thus had to decide "whether federal courts possess ancillary jurisdiction over new actions in which a federal judgment creditor seeks to impose liability for a money judgment on a person not otherwise liable for the judgment," *Id.* at 351. On these facts, the Court found nothing in ERISA that would stretch federal standards that far. It emphasized that the complaint alleged no violation of ERISA or the Plan, and held that such allegations were essential for a veil-piercing action. *Id.* at 353–54. Without ancillary jurisdiction, the case did not belong in federal court.

Recognizing that this issue remains open, we nonetheless do not find in *Peacock* a clear signal undermining the Court's longstanding recognition that cases that *do* rest on ERISA or Plan language are both within the federal court's subject-matter jurisdiction and typically governed by federal law. In our

case, the Funds argue that CWG is engaged in an ongoing violation of the NLRA and ERISA by failing to comply with an extant collective bargaining agreement. To the extent that *Peacock* rested on a concern about the existence of a federal basis for the action, it does not appear to apply here. Particularly in light of CWG's failure to suggest that state law governs the alter-ego and successor liability questions, we see nothing inappropriate about applying federal law.

## B

Both successor and alter-ego liability incorporate a *scienter* component coupled with an analysis of similarities between the old and new entities. Successor liability requires notice of the obligation by the new entity, while alter-ego liability requires more: a fraudulent intent to avoid collective bargaining obligations. *Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995) (successor liability); *Cent. States, Se. & Sw. Areas Pension Fund*, 85 F.3d at 1287–88 (alter-ego liability). Once *scienter* is established, successor liability is imposed if there is a "substantial continuity in the operation of the business before and after the sale." *Tasemkin*, 59 F.3d at 49 (quoting *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 748 (7th Cir. 1994)). For alter-ego liability, the Funds additionally must show "substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Rabine*, 161 F.3d at 433. The former holds the successor liable for violations of labor and employment law by the predecessor, while the latter holds the alter ego to the terms of the full collective bargaining agreement entered by the predecessor. See *Howard Johnson*, 417 U.S. at 259 n.5. Both of these analyses are fact intensive, but they boil down to a simple question: despite two entities'

legal separation, does the evidence suggest they are one and the same?

## II

Here, the district court approached the issue by marching through a lengthy list of factors identified in several earlier decisions from this court, including *Tasemkin*, 59 F.3d 48, *Sullivan v. Running Waters Irrigation, Inc.*, 739 F.3d 354 (7th Cir. 2014), and *Cent. States, Se. & Sw. Areas Pension Fund v. Sloan*, 902 F.2d 593 (7th Cir. 1990). It found that "there are simply too many differences between the entities" for any reasonable factfinder to impose successor or alter-ego liability. In so finding, however, the court failed to credit the full range of evidence the Funds presented and it crossed the line between taking the evidence in the light most favorable to the nonmoving party, and weighing the evidence for itself.

Our own review of the evidence presented by the Funds for purposes of the summary judgment motion persuades us that there are striking continuities between Gianino Plastering's operations and the newly-formed CWG. As we noted at the outset, Wally was the sole owner of Gianino Plastering and shuttered the company in 2012; CWG opened within days of Gianino Plastering's closing and was solely owned by Curt. The companies' ownership, name, and address may have changed, but the transition of operations and employees from Gianino Plastering to CWG tells a different story.

The crucial period for analyzing the transition runs from July 27 to August 14. On July 27, the presiding magistrate judge recommended a $196,940.73 judgment against Gianino Plastering after an evidentiary hearing on damages. Wally undisputedly told Curt about the ruling. Not quite three weeks

later, on August 14, the district court adopted the magistrate judge's recommendation and entered judgment in that amount against Gianino Plastering. On the same day, Curt registered CWG Plastering as a Missouri LLC.

Meanwhile, Gianino Plastering was at work as a plastering subcontractor on a residential job called the LJPP project. Sometime in late July, Wally and Curt visited the LJPP general contractor and informed him that Gianino Plastering was shutting down but that CWG would honor Gianino Plastering's bid and complete the work. Documents as late as July 30 still listed Gianino Plastering as the plastering subcontractor, yet CWG later accepted a $28,800 payment for work completed through July 31. The subcontract was transferred to CWG on August 17, only three days after its formation. CWG then completed the job in Gianino Plastering's stead.

Gianino Plastering employed four people at the time of its closing: Wally, Curt, Daniel Giger, and James Gildehaus. All but Wally joined CWG's payroll immediately after Gianino Plastering went out of business, presumably while still working on the LJPP project. Curt, Giger, and Gildehaus received their last Gianino Plastering paycheck on August 10, the Friday before the judgment was entered. The next Friday, August 17, Curt and Gildehaus received a CWG paycheck. Gildehaus was aware that he had switched employers because Curt called him and said "Hey, Wally's being sued and I'm starting my own company now and Wally's no longer in the picture." Giger missed a week of pay, receiving his first CWG check on August 24, but he understood that gap to be caused by the Funds' lawsuit against Gianino Plastering. Giger testified that he did not even realize that he was working for a new company. Wally was not formally employed by CWG that

year (he began receiving CWG pay in August 2013), but there is evidence that he was involved with the new company in 2012. He signed a lien waiver on behalf of CWG on November 30 and was seen at the LJPP jobsite. In short, a trier of fact could find that CWG adopted Gianino Plastering's workforce as its own after the judgment was entered.

In an attempt to downplay the continuities between the two companies, CWG emphasizes what it sees as major differences between the two entities. It stresses that CWG was solely owned and managed by Curt, while Gianino Plastering was solely owned and managed by Wally. But the Funds have offered evidence undermining this clean distinction. Wally was the sole CWG contact for at least one client; he submitted bids for at least two CWG projects; and he accompanied Curt to meetings early in CWG's existence. Furthermore, "familial control" can be treated as "common ownership and control" in appropriate labor cases. *NLRB v. Dane Cnty. Dairy*, 795 F.2d 1313, 1322 (7th Cir. 1986). A reasonable factfinder could find both common ownership and control between the two entities here.

The parties dispute the materiality of CWG's capitalization, common equipment, and shared clients. But the best we can say for CWG is that these disputed items are just that: disputes to be resolved at trial. CWG makes much of Curt's initial financing of CWG with $5,500 of his own money. A more significant source of initial funds, however, was the $28,800 payment that CWG accepted for Gianino Plastering's work on the LJPP project. According to its bank statements, CWG could not have met its obligations for its first month of operation using the $5,500 deposit alone. Similarly, the parties dispute whether it is significant that CWG used Gianino Plastering's

trucks. Gianino Plastering sold the trucks to a third party that immediately leased them to CWG. Evidence in the record of this transaction is sparse; perhaps it was a straw transaction, or perhaps it was an arms-length bargain. But there is room for a factfinder to adopt either interpretation. Last, we know that CWG and Gianino Plastering shared eight customers. But we do not know from the record how many total customers each entity serviced; it could be eight of eight, or it could be eight of one hundred. Without a denominator, this fact is not conclusive of liability; it is evidence for a factfinder to weigh.

Considered as a whole, the record would allow reasonable factfinders to differ. As to *scienter*, the Funds have strong evidence of intent and undisputed evidence of knowledge, but a factfinder could choose to believe Curt's account over Gildehaus's. Similarly, the Funds have submitted evidence that could suggest "substantial continuity in the operation of the business," *Tasemkin*, 59 F.3d at 49 (quoting *G-K-G, Inc.*, 39 F.3d at 748), and "substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership," *Rabine*, 161 F.3d at 433. The Funds' evidence is not flawless—after all, it is the rare case that can meet that standard—but the district court was too quick to grant summary judgment in CWG's favor.

### III

Because the Funds have presented sufficient evidence to proceed to trial on both theories, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

HAMILTON, *Circuit Judge*, concurring. I join fully in Chief Judge Wood's opinion. I write separately to address concerns raised in Judge Easterbrook's opinion concurring in the judgment. The federal rules of successorship liability under ERISA and federal labor law evolved as equitable doctrines to address the common practice of employers trying to sell their businesses so as to avoid their obligations under federal law. In developing those rules, courts have indeed kept an eye on how those rules would likely affect people to alter their decisions in buying and selling businesses or their assets.

That is evident in *Indiana Electrical Workers Pension Benefit Fund v. ManWeb Services, Inc.*, 884 F.3d 770 (7th Cir. 2018), discussed in Judge Easterbrook's concurrence. In that case, we remanded for a trial on the issue of successorship liability. That result could not have come as a surprise. At the time of the original asset purchase, the buyer in that case actually did anticipate the possibility of successor liability. The buyer knew the seller faced potential withdrawal liability, and it knew full well that successor liability was a possibility. The buyer negotiated the deal with that prospect in mind, even obtaining an indemnity agreement from the sellers covering this very risk of successor liability. 884 F.3d at 783, citing *Tsareff v. ManWeb Services, Inc.*, 794 F.3d 841, 848 (7th Cir. 2015) (prior appeal); see also *Golden State Bottling Co v. N.L.R.B.*, 414 U.S. 168, 172 n.2 (1973) (noting successor's ability to negotiate for indemnification regarding liability for predecessor employer's liability for unfair labor practices). Moreover, the parties in *ManWeb* had structured their asset purchase agreement to deliver all the cash to a different, favored creditor of the (insolvent) seller, stiffing the union pension plan. In short, the result in *ManWeb* did not impose a tax on a buyer that lacked sufficient foresight or astute lawyers. In the case now before

us, the evidence does not show a detailed and well-lawyered asset purchase agreement, as in *ManWeb*. It does include powerful evidence of a bad-faith effort to continue the earlier business while favoring certain creditors and leaving these Funds unpaid. If bankruptcy would be a better alternative, fairer to all creditors of an insolvent business, so be it.

EASTERBROOK, *Circuit Judge*, concurring in the judgment. I agree with my colleagues that the case must be remanded, but I do not agree with them about what ought to happen next. I have reservations about choice of law and the content of federal successorship law to the extent it applies.

Because the Funds seek to recover from CWG Plastering directly under two federal statutes, the district court has subject-matter jurisdiction. It does not follow that federal law applies to all of the Funds' claims. The Funds present two distinct claims: that CWG Plastering is liable in its own right as the successor of Gianino Plastering and that CWG Plastering must pay a judgment the Funds hold against Gianino Plastering. The first claim arises under federal law. But the second sounds like the same sort of theory that *Peacock v. Thomas*, 516 U.S. 349 (1996), held to rest on state law. My colleagues recognize that *Peacock* appears to govern the attempt to collect the judgment from an entity that was not a party to it. They add that they do not see in *Peacock* a "clear signal undermining the Court's longstanding recognition that cases that *do* rest on ERISA or Plan language are … typically governed by federal law." Slip op. 5, emphasis in original. I agree with that statement, but, because the attempt to collect from CWG Plastering the judgment against Gianino Plastering does *not* rest on ERISA or the Plans' language, this claim is governed by state law. (In *Peacock* itself the underlying judgment rested on ERISA, which therefore cannot be enough to call for the application of federal law to collection proceedings.) It complicates litigation to have one claim for relief rest on one body of law and a second claim for relief on a different body of law, but this happens all the time. *Peacock* requires the application of state law to the Funds' effort

to collect from B (CWG Plastering) an ERISA judgment entered against A (Gianino Plastering).

The Funds' direct ERISA claim rests on federal law, but the statute does not supply a rule of decision. We must apply federal common law. What is the source of that law? Sometimes federal common law is drawn from state law. See, e.g., *United States v. Kimbell Foods, Inc.*, 440 U.S. 715 (1979); *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90 (1991). In a case arising under federal environmental law—and like this one involving a theory of third-party liability—the Justices raised that possibility but did not decide when it would be appropriate to use state-law principles as the basis of federal rules. *United States v. Bestfoods*, 524 U.S. 51, 63–64 n.9 (1998). The Court did not come to a conclusion because the parties had not presented the issue properly. Just so here. The parties have briefed this appeal without so much as mentioning the source-of-law problem, which means that we properly leave the subject for another day.

My colleagues conclude that federal common law creates successorship liability whenever the original and successor businesses are similar enough—where "enough" depends on juggling the many factors a creative legal mind can envision. Maybe so; plenty of judicial opinions proceed that way. My colleagues cite a sample of them. This ambulatory approach confounds businesses by being so vague that it is impossible to know the legal rule until lengthy and expensive suits are over. Cf. *Secretary of Labor v. Lauritzen*, 835 F.2d 1529, 1539–45 (7th Cir. 1987) (concurring opinion). Our suit is in its third year, and all my colleagues are willing to venture is that "the record would allow reasonable factfinders to dif-

fer." Slip op. 10. I pity the judge who must draft the instructions telling jurors how to proceed.

More: it is necessary to ask how this fundamentally *ex post* perspective affects parties' behavior *ex ante*. If "similar enough" firms must pay their predecessors' debts, what happens? Will pension funds be the winners? Today's decision for these Funds may come at the expense of all funds tomorrow.

Consider the facts of *Indiana Electrical Workers Pension Benefit Fund v. ManWeb Services, Inc.*, 884 F.3d 770 (7th Cir. 2018). ManWeb paid about $260,000 to buy Freije's assets. It sold (or never used) most of the physical assets and was essentially acquiring the old firm's name and goodwill. This led the court to conclude that it may well be Freije's successor and, if so, must pay more than $660,000 that Freije owed to a pension fund. Successorship raised the assets' price to $920,000 (the total to Freije plus the fund), much more than ManWeb agreed to pay.

Businesses fail, and leave creditors unpaid, precisely when their assets are worth less than their liabilities. If buying the assets means also accepting the liabilities, then the assets have a negative value and purchases do not occur. When that happens pension and welfare-benefit funds are worse off, losing even an ability to recover the purchase price from investors for their own benefit. Employees and customers also may suffer losses when a business cannot continue under new ownership.

I use the numbers in *ManWeb* to illustrate a problem, not to reargue the facts of that case. If as Judge Hamilton suggests the purchase price was below the value of the assets,

and the buyer's payment was used for the benefit of an inside creditor rather than the fund, the right response should have been a fraudulent-conveyance action, which would have enabled the fund to realize the assets' true value. A successorship judgment requiring the buyer to pay the full amount of the debt, even when that exceeds the assets' net value, is problematic.

Courts should consider how judge-made rules lead people to alter their behavior. We stressed this recently in *Illinois Department of Revenue v. Hanmi Bank*, No. 17-1575 (7th Cir. July 9, 2018). When bankruptcy judges allowed the sale of assets free of successorship liability for tax debts, see 11 U.S.C. §363(f), a tax collector protested that its priority claim had not received the protection to which the Bankruptcy Code entitles it. We asked what that protection would have entailed, given the existence of other creditors (some of them secured) and buyers' ability to make their own adjustments. One potential adjustment would have been not to purchase any assets; then the tax collector also could not have recovered. Another potential adjustment would have been to acquire the assets through a shell corporation without the ability to pay the debtor's back taxes. Again the tax collector could not have recovered. Because several lawful alternatives to the sale in bankruptcy left the tax collector empty-handed, the court concluded that nothing was all the tax collector could get as "adequate protection" under §363.

What was true in *Hanmi Bank* is equally true of the Funds' claims. One lawful alternative would have been to have the Funds' claims discharged in bankruptcy. Another would have been a sale of assets in bankruptcy, with liability stripped off under §363(f) on the same theory as in *Hanmi*

*Bank.* The former approach—bankruptcy with no successor—would have been worse for the Funds, the workers, and the customers alike. A sale of assets under §363(f) also would have left the Funds with nothing. If Curt Gianino had consulted a good bankruptcy lawyer before taking over his father's business, he would have been told these things. Ordering him to pay about $200,000 to the Funds is a steep penalty for the lack of legal advice and will serve as an incentive for family businesses to throw creditors, workers, and customers to the wolves. Is that really what federal common law should achieve?