In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 16-2840

INDIANA ELECTRICAL WORKERS PENSION BENEFIT FUND, et al.,

*Plaintiffs-Appellants*,

*v.*

MANWEB SERVICES, INC.,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 10-cv-00980 — **Sarah Evans Barker**, *Judge*.

———————————

ARGUED DECEMBER 8, 2016 — DECIDED MARCH 12, 2018

———————————

Before MANION, KANNE, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. For a second time in this case, we consider whether defendant-appellee ManWeb Services, Inc. is a successor in interest to a defunct employer that owes withdrawal charges to a multiemployer pension plan. The original employer was Tiernan & Hoover, but everyone refers to it as "Freije" after its key founder, William Freije, and his son Richard. ManWeb entered into an asset purchase agreement with

Freije in 2009. Freije was a small contractor specializing in refrigeration and cold-storage engineering for commercial and industrial projects. ManWeb was a larger company offering a wider range of contracting services, with the notable exception, before it acquired Freije's assets, of refrigeration projects such as cold-storage warehouses. Freije's unionized electricians were covered by a multiemployer pension plan.

The Employee Retirement Income Security Act of 1974 (ERISA), as amended by the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), establishes withdrawal liability for employers leaving a multiemployer pension plan. 29 U.S.C. § 1381. In this case, Freije withdrew from the Indiana Electrical Workers Benefit Fund ("the Fund"). The Fund assessed withdrawal liability of $661,978 against Freije. When Freije failed to pay, the Fund brought this action against both Freije and ManWeb as a successor in interest to Freije. Successor liability can apply under the MPPAA when the purchaser had notice of the liability and there is continuity of business operations. *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1329 (7th Cir. 1990). At this point, the only issue in the case is the claim against ManWeb based on successor liability.

The district court granted summary judgment for ManWeb in 2013, finding it lacked notice of Freije's withdrawal liability. In the first appeal, we remanded, finding that "ManWeb had sufficient pre-acquisition notice of [Freije's] contingent withdrawal liability to satisfy the federal successor liability notice requirement." *Tsareff v. ManWeb Services, Inc.*, 794 F.3d 841, 848 (7th Cir. 2015) ("*ManWeb I*"). On remand, the district court again granted summary judgment for ManWeb, concluding that the Fund had not shown sufficient continuity

of business operations to support successor liability. The Fund has appealed again. We find ourselves in respectful disagreement with our colleague on the district court. In the totality of relevant circumstances, ManWeb's purchase of and use of Freije's intangible assets—its name, goodwill, trademarks, supplier and customer data, trade secrets, telephone numbers and websites—and its retention of Freije's principals to promote ManWeb to existing and potential customers as carrying on the Freije business under ManWeb's larger umbrella, weigh more heavily in favor of successor liability than the district court recognized. We vacate the district court's decision and remand for further consideration of this equitable determination.

I.  *Undisputed Facts and Procedural Background*

ManWeb is an Indianapolis company that now performs a range of industrial construction services. In August 2009, ManWeb paid $259,360 for the assets of Tiernan & Hoover, another, much smaller Indianapolis construction company specializing in cold-storage facilities. *ManWeb I*, 794 F.3d at 843. Tiernan & Hoover did business under the name The Freije Company, and like everyone else in this case, we refer to it as Freije. Freije was a party to a collective bargaining agreement with International Brotherhood of Electrical Workers Local 481; ManWeb was non-union. As a union employer, Freije contributed to the Fund and under the MPPAA was required to pay withdrawal liability of $661,978 when it ceased operations. See *ManWeb I*, 794 F.3d at 843–44. ManWeb did not make any contributions to the Fund after its purchase of Freije. *Id.* at 844.

A. *The Fund's First Appeal*

Neither Freije nor ManWeb made payments to satisfy the withdrawal liability, and Freije never took advantage of its right to seek review of the assessment amount or to challenge the assessment in arbitration. See 29 U.S.C. §§ 1399(b)(2)(A) & 1401(a)(1). The assessment therefore became due when the statutory deadline for contesting the liability passed. See 29 U.S.C. § 1401(b). The Fund then filed this suit against Freije and added ManWeb as a defendant based on successor liability. See 29 U.S.C. §§ 1132(e)–(f) & 1451(c) (authorizing jurisdiction). Both sides filed cross-motions for summary judgment.

The district court granted the Fund's motion against Freije, finding that Freije owed the withdrawal liability assessment in full. The district court also held, however, that ManWeb was not responsible for successor liability, and the court granted ManWeb's motion for judgment as a matter of law. Successor liability is an equitable doctrine and is imposed when "there exist sufficient indicia of continuity between the two companies and … the successor firm had notice of its predecessor's liability." *Artistic Furniture*, 920 F.2d at 1329. Finding that "it was impossible for ManWeb to have notice of any existing withdrawal liability," the court found no successor liability without evaluating whether there was substantial continuity of business operations. See *ManWeb I*, 794 F.3d at 845.

The Fund appealed the denial of successor liability. Because successor liability is an equitable doctrine, our decision rested on an analysis of MPPAA policy goals that seek to ensure "the responsibility for a withdrawing employer's share of unfunded vested pension benefits is not shifted to remaining employers." *Id.* at 846. We concluded that ManWeb had

notice of Freije's contingent withdrawal liability. *Id.* at 848. That liability was included in the Asset Purchase Agreement and financial statements, and ManWeb had included in the agreement a provision trying expressly to disclaim that liability. We reversed and remanded for analysis of the continuity requirement. *Id.* at 850.

B. *Remand and the Current Appeal*

On remand, the district court again found in favor of Man-Web on cross-motions for summary judgment, this time finding no substantial continuity of business operations from Freije to ManWeb. The district court evaluated five clusters of continuity factors: business processes and services, facilities and equipment, workforce, management and ownership, and customers. The court concluded that "ManWeb did not and has not continued [Freije's] business without interruption or substantial change." The court then addressed the balance of equities and found that the factors and policies weighed against successor liability.

II. *Analysis*

Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). We review *de novo* the district court's grant of summary judgment. *McDougall v. Pioneer Ranch Ltd. Partnership*, 494 F.3d 571, 575 (7th Cir. 2007). Here the material facts are not disputed.

A. *MPPAA Policy Goals and Successor Liability*

Multiemployer pension plans are based on defined contributions and pay defined benefits. If one employer defaults on its contributions, whether by delinquency or withdrawal,

other employers must make up the difference to cover the defined benefits owed to participants. *Artistic Furniture,* 920 F.2d at 1327–28, citing *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service Inc.,* 870 F.2d 1148, 1151 (7th Cir. 1989). Unpaid contributions also result in the loss of investment income that could have been earned by the plan. *Id.* at 1328. Both types of losses put financial pressure on the remaining employers and discourage new employers from joining. The financial stability of the plan is put in jeopardy, and plan beneficiaries risk losing their pension benefits.

The MPPAA amended ERISA to protect multiemployer plans from these damaging consequences of withdrawal. See *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 723–25 (1984); H.R. Rep. 96-869, Part 1, at 67–68, 75, 1980 U.S.C.C.A.N. 2918, 2935–36. In enacting the MPPAA, Congress showed "a desire to (1) relieve the financial burden placed upon remaining contributors to a multiemployer fund when one or more of them withdraws from the plan; (2) avoid creating a severe disincentive to new employers entering the plan; and (3) prevent the creation of funding deficiencies." *ManWeb I,* 794 F.3d at 845–46 (internal citations and quotation marks omitted). Withdrawal liability, a company's share of unfunded vested benefits, is imposed on an employer that ends its participation in a multiemployer plan. *ManWeb I,* 794 F.3d at 845; *Artistic Furniture,* 920 F.2d at 1328. The House Committee on Education and Labor explained in enacting the MPPAA: "Employer withdrawal liability will help to insulate a plan from the adverse effects of a sustained decline in the contribution base." H.R. Rep. 96-689, Part 1, at 67, 1980 U.S.C.C.A.N. at 2395. Successor liability may be imposed to prevent other employers from having to make up the difference left by employers who have left the fund without paying

their liabilities but whose businesses continue. *Artistic Furniture*, 920 F.2d at 1328. (In extreme cases of plan failure, the federal Pension Benefit Guaranty Corporation may be called upon to make up shortfalls caused by withdrawing employers who default on their obligations. See 29 U.S.C. § 1431.)

Asset purchase agreements typically provide that the buyer acquires the assets of the selling company but does not assume the seller's liabilities. E.g., *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995); *Artistic Furniture*, 920 F.2d at 1325; *Travis v. Harris Corp.*, 565 F.2d 443, 446 (7th Cir. 1977). This general rule emerged under the common law to "maximize the fluidity of corporate assets," *Artistic Furniture*, 920 F.2d at 1325, and ManWeb's agreement to buy Freije's assets tried to fit that mold. The general rule, however, is not absolute, and successor liability doctrine provides an important exception. It applies when "an employer … substantially assumes a predecessor's assets, continues the predecessor's operations without interruption or substantial change, and … has notice … at the time of acquisition." *Id.* at 1326 (using decisions under National Labor Relations Act to guide application of MPPAA); see also *Tasemkin*, 59 F.3d at 49 (observing that this exception "protect[s] federal rights [and] effectuate[s] federal policies").

Successor liability extends throughout federal employment law to protect federal statutory policies from corporate artifice. From its origins in enforcing the National Labor Relations Act, successor liability has served to vindicate policies articulated in, for example, Title VII of the Civil Rights Act of 1964, the Fair Labor Standards Act, ERISA, and 42 U.S.C. § 1981, among others. See *Golden State Bottling Co. v. N.L.R.B.*,

414 U.S. 168 (1973) (NLRA); *Teed v. Thomas & Betts Power Solutions, L.L.C.*, 711 F.3d 763 (7th Cir. 2013) (FLSA); *Artistic Furniture*, 920 F.2d 1323 (MPPAA); *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228 (7th Cir. 1986) (Title VII); *Musikiwamba v. ESSI Inc.*, 760 F.2d 740 (7th Cir. 1985) (§ 1981).

The issue of successor liability depends on the particular facts and the legal duties at stake, so, as the district court recognized, a new employer or buyer of assets "may be a successor for some purposes and not for others." *Howard Johnson Co., Inc. v. Detroit Local Joint Executive Bd.*, 417 U.S. 249, 262 n.9 (1974) (holding under NLRA that purchaser of hotel assets was not required to arbitrate with union about its decision not to hire all of seller's employees). Decisions about successor liability require an equitable balancing of the national policies at stake and the interests of the affected parties. *Resilient Floor Covering Pension Trust Fund Bd. of Trustees v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1091 (9th Cir. 2015); *ManWeb I*, 794 F.3d at 848; see also *Artistic Furniture*, 920 F.2d at 1326–27.

Successor liability under the MPPAA requires two distinct components: notice of the potential liability and substantial continuity of the business. *ManWeb I*, 794 F.3d at 845, quoting *Tasemkin*, 59 F.3d at 49. In our prior opinion, we determined that ManWeb had notice, *ManWeb I*, 794 F.3d at 847, so we focus now on continuity. Recognizing the ingenuity often shown in reorganizing businesses and their assets, courts consider the totality of the circumstances to determine continuity, focusing on the particulars of the case and the nature of the liability at issue. See *Fall River Dyeing & Finishing Corp. v. N.L.R.B.*, 482 U.S. 27, 43 (1987) (assessing business activities, workforce, working conditions, supervisors, production processes, products, and customer base to determine successor

liability under NLRA); *Artistic Furniture*, 920 F.2d at 1329 (assessing workforce, supervisory personnel, plant, machinery, equipment, products, assumption of work orders and warranty claims, and management to determine successor liability under MPPAA); *Sullivan v. Running Waters Irrigation, Inc.*, 739 F.3d 354, 358 (7th Cir. 2014) (assessing leadership, employees, customers, office space, equipment, and services to determine successor liability under ERISA); *N.L.R.B. v. Jarm Enterprises, Inc.*, 785 F.2d 195, 200 (7th Cir. 1986) (assessing business operations, plant, workforce, job positions, working conditions, supervisors, machinery, equipment, methods of production, and manufactured product or service to determine successor liability under NLRA). The Ninth Circuit's opinion in *Resilient Floor Covering* provides a detailed and helpful review of the development of successor liability under a range of federal labor and employment laws. See 801 F.3d at 1088–96.

B.  *The "Big Buyer" Loophole?*

In arguing for lack of continuity here, ManWeb emphasizes several factors that we view quite differently. First, ManWeb argues, and the district court found, a lack of continuity in the business services offered because ManWeb, before it bought Freije's assets, had not offered the industrial refrigeration construction services that it offered after the purchase. ManWeb also points out, as did the district court, that the 13 Freije employees who joined ManWeb comprised only a small fraction of ManWeb's post-purchase workforce. Third, ManWeb and the district court noted that only 1.3 percent of ManWeb's overall electrical projects and less than 1 percent of its electrical work revenue came from completion of Freije's customers' contracts pending at the time of the purchase.

The Fund argues that these aspects of the district court's analysis undermine the policies of the MPPAA by creating what amounts to a "big buyer" loophole for successor liability, defeating a finding of continuity even where a large buyer in essence swallows a smaller seller whole and continues its business as part of the buyer's business. We agree. Large buyers of assets should not escape successor liability just because of their size, yet the district court's calculations logically point toward that result. Those calculations lose sight of the proper focus, which is the extent to which the predecessor company's business continues after the asset purchase.

A hypothetical example with simple arithmetic illustrates the problem with ManWeb's argument. Suppose Smith Company has 25 employees and Jones, Inc. has 475 employees. Jones acquires Smith's assets, and 100 percent of the Smith employees go to work for Jones. Under ManWeb's arguments, however, the relevant number is just 5 percent—the proportion of Jones employees who are former Smith employees. Or consider the transfer of customers and revenue. Suppose Smith has 25 customers and annual revenues of $25 million, while Jones has 475 customers and annual revenues of $475 million. And suppose that all Smith customers and their revenue move their business to Jones. In our view, that would reflect complete continuity of the seller Smith's business, even though its customers and revenues would be only 5 percent of the buyer's business.

Although the numbers will never be so stark, this example shows why the totality-of-the-circumstances analysis must focus more on the proportion of the seller's workforce, business, and customers that move to the buyer, regardless of the extent to which they might be diluted in a much bigger buyer's

workforce, business, or customer base. The actual facts here are not as stark as the Smith–Jones hypothetical, but they are similar enough that we conclude the district court's method was inappropriate and that the continuity factors must be re-evaluated.[1]

C.  *Continuity of Business Operations*

In the parties' first appeal, we observed that "in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, empha-

---

[1] On this point, the district court relied on the analysis in the Ninth Circuit's *Resilient Floor Covering* opinion. See 801 F.3d at 1098. As noted above, that opinion is helpful on a number of aspects of this case. In focusing on whether a majority of the new workforce previously worked for the old employer, however, *Resilient Floor Covering* drew from successor liability cases dealing with a new employer's duty to bargain with the union representing the old employer. *Id.*, citing *N.L.R.B. v. Jeffries Lithograph Co.*, 752 F.2d 459, 464 (9th Cir. 1985), and *Fall River Dyeing*, 482 U.S. at 46 n.12, among other cases. When the question is whether employees of the new employer should be represented by the union from the old employer, that is surely the correct focus because of the majority rule that applies in choosing representation for collective bargaining. Otherwise successor liability could be used to impose a union on a large number of employees who do not support it. When the issue is different, such as whether the new employer should take on the withdrawal liabilities of the old employer, however, different considerations apply, and the risk of creating an arbitrary loophole for big buyers of assets should be avoided. The Sixth Circuit made this point persuasively in *Grace v. USCAR*, 521 F.3d 655, 672 n.16 (6th Cir. 2008) (if continuity is measured by whether majority of new employer's employees came from old employer, "then any large entity that absorbed a much smaller company in any fashion would never be considered to be a substantial continuation of the small company"), quoting district court opinion.

sis on the facts of each case as it arises is especially appropri-
ate." *ManWeb I*, 794 F.3d at 848, quoting *Howard Johnson Co.*,
417 U.S. at 256. This remains true in this second appeal. We
find it most helpful to assess the continuity of relevant factors
in six categories: ownership, physical assets, intangible assets,
management and workforce, business services, and custom-
ers.

### 1. *Continuity of Ownership*.

There was no shared ownership between ManWeb and
Freije. We agree with the district court that there was no con-
tinuity of ownership, and this factor does not support succes-
sor liability for ManWeb.

### 2. *Continuity of Physical Assets*.

ManWeb purchased Freije's assets for $259,360. Not need-
ing the physical assets, such as vehicles, tools, and office
equipment, ManWeb sold most of the property at auction and
did not use it in the operation of its business. ManWeb also
did not use Freije's prior location. The district court found
these facts weigh against successor liability, and we agree.

### 3. *Continuity of Intangible Assets*.

One may wonder, then, why ManWeb purchased the as-
sets of a struggling company when it had no interest in the
location, facilities, or physical assets. The answer is the Freije
name. The Indianapolis construction industry knew the
names of William and Dick Freije. Their reputations and the
reputation of the company that bore their name were worth
the purchase price to ManWeb because it could market its
business as a continuation of Freije's business.

The asset purchase agreement gave ManWeb not just physical equipment, which it did not need or want, but also the Freije trademark and tradename, supplier lists, trade secrets, contracts, customer lists and data, telephone numbers, and internet domain names. In other words, ManWeb purchased everything it needed to represent itself, or at least a part of itself, as the continuation of the Freije business. Immediately after the purchase, internet traffic from www.thefreijecompany.com was forwarded to ManWeb's site. At the same time, ManWeb had Freije telephone lines and mail forwarded to ManWeb's office. Outgoing mail was sent on letterhead that had both The Freije Company logo and the ManWeb logo in an attempt "to retain as many customers" as possible, according to ManWeb's owner. In short, ManWeb immediately began using Freije's goodwill and other intangible assets to hold and attract business.

ManWeb's owner, Michael Webster, testified that he expected to gain a business advantage using the Freije name, and ManWeb filed a Certificate of Assumed Business Name with the Indiana Secretary of State for "The Freije Company." According to a former Freije owner, the "niche" market of industrial refrigeration was dominated by "word of mouth," and new opportunities came about not through advertising but through customers in the industry "network[ing] with each other."

When ManWeb bought Freije's assets, ManWeb issued a press release describing the transaction not as an asset purchase but as an acquisition and merger. That is the language of continuity. Fourteen months after the asset purchase, ManWeb started doing business as Freije Engineered Solutions, and phones were answered using the Freije name. At the time

of the district court's decision several years after the execution of the asset purchase agreement, ManWeb was doing business as Freije-RSC Engineered Solutions. ManWeb even tried to appropriate the history of the Freije name and company. Man-Web started operations in 2003, but in 2012 (and even today), the "History" page on ManWeb's website has described the company's origins with the Freije family in 1959, the ManWeb acquisition in 2009, and ManWeb's restructuring and rebranding of its business as "Freije Engineered Solutions."

The evidence shows that ManWeb bought Freije's assets—especially the assets associated with goodwill and reputation—in large part because it wanted to convince customers that it was, in fact, a continuation of the old Freije company. This continuity of the tradename and related intangible assets, together with the intention behind it, weighs strongly in favor of continuity of business operations.

### 4. *Continuity of Workforce.*

Examining separately the categories of management, supervisors, and rank-and-file employees clarifies the extent of continuity and change to Freije's business after the purchase agreement.

### a. *Continuity of Management.*

Three senior managers moved directly from Freije to Man-Web. Dick Freije, an original owner and a mechanical/refrigeration engineer, brought with him the Freije name and his personal reputation. At ManWeb he became Director and Refrigeration Engineer. Michael Hoover, president of Freije, likewise became a Director and Refrigeration Engineer at Man-Web. Gregory Taylor, previously vice president at Freije and a part owner, became the Business Development Manager for

ManWeb. Manweb publicized these men's employment with it to keep old Freije customers and attract new ones. This publicity indicates that their continuity was important to Man-Web, and like the district court, we find continuity of management.

b.   *Continuity of Supervisors.*

Three former Freije supervisors were hired by ManWeb. However, there is no evidence as to the supervisory structure of ManWeb and how those former Freije supervisors fit into it. On this record, we agree with the district court and find no substantial continuity of supervisors.

c.   *Continuity of Employee Workforce.*

At the time of the sale, Freije had about 40 employees. Three were members of the electrical workers union. Thirteen of the forty (33 percent of Freije's workforce) were hired by ManWeb; the remainder left to seek work elsewhere. No former Freije employees who were employed at ManWeb had been members of the union. After acquiring Freije and hiring thirteen of its employees, ManWeb's total workforce had 238 employees. In other words, former Freije employees made up 5 percent of ManWeb's workforce.

The district court interpreted these numbers as showing minimal continuity of workforce. We disagree. As explained above, the district court's approach focuses more on the continuity of the pre-purchase ManWeb business at the expense of examining the more critical degree of continuity of Freije's business. It also overlooks the big buyer problem. Even if ManWeb had hired Freije's entire staff of 40, former Freije employees would have amounted to just 15 percent of ManWeb's

total workforce. When a large company like ManWeb pur-
chases a small company like Freije, using the larger com-
pany's workforce as the denominator of the relevant fraction
will understate the continuity of the workforce.

The fact that one third of Freije's workforce continued at
ManWeb is not insignificant. In the big buyer context, a pur-
chaser in the same general industry as the seller often will re-
tain lower-level staff performing substantially the same func-
tions as those at the smaller company. More important in this
context is the retention of key people such as Dick Freije and
the other managers who went to work for ManWeb. These
workers possessed unique knowledge, skills, and abilities not
present in ManWeb before the purchase. Their presence at
ManWeb signaled continuity to customers and enabled the
Freije team that made the transition to ManWeb to offer that
continuity of service to customers.

The district court emphasized the fact that no union em-
ployees went to work for ManWeb. On its face, this would
seem to indicate that the contribution base would not be dam-
aged, since at least some of those employees went to other
companies that were, presumably, contributing to the Fund.
However, the district court's emphasis does not account for
the fact that ManWeb had chosen to be non-union. This is
what the MPPAA warns against: an employer who "stays in
the industry but goes non-union and ceases making payments
to the plan." *Resilient Floor Covering*, 801 F.3d at 1094. Thus,
we find that continuity of one third of Freije's employees, in-
cluding the continuity of key individuals, tends to indicate
significant continuity of the workforce.

5. *Continuity of Business Services.*

Before it acquired Freije's assets, ManWeb already offered a broad array of engineering services. The record also shows, though, that ManWeb had consistently been unable to launch industrial refrigeration projects, despite being a national player in the market to design and build warehouses. Freije specialized in industrial refrigeration: "engineering, construction, and service for cold storage facilities." Before the purchase, ManWeb was not doing refrigeration work in its projects. After the purchase of Freije assets, ManWeb was able to include refrigeration services in its broader package of offerings.

The district court concluded that the narrow overlap between the refrigeration services offered by Freije and the broad range of services offered by ManWeb weighed against a finding of successor liability. We disagree, and our disagreement on this point is again related to our reluctance to create a "big buyer" loophole for successor liability. When the overlap is considered in light of the relative sizes of the businesses, the continuity of services comes into clearer focus. The overlap in services is slight if we consider the fraction of ManWeb's overall post-purchase services that involved refrigeration work. In addition to industrial refrigeration, the much larger ManWeb also provided services in engineering, installation, HVAC, plumbing, electrical, and security systems. The overlap is complete, however, if we focus on the fraction of services previously offered by Freije (industrial refrigeration) that were offered by ManWeb after the purchase. The purposes of the MPPAA fit better with the second perspective. There was significant continuity of Freije's refrigeration services before and after the purchase.

6.  *Continuity of Customers.*

As part of the asset purchase agreement itself, ManWeb agreed to assume ongoing Freije contracts. It also agreed to assume Freije's existing warranties. As part of its agreement to assume ongoing contracts, ManWeb agreed to use its work-force to complete the work, but Freije's owners and sellers would pay the cost of labor, material, rental, subcontracts, and an hourly burden (overhead) rate. The profits of the work, however, were to go to Freije and to be applied toward Freije's owners' debts.

The district court concluded that this profits arrangement weighed against continuity. We disagree. ManWeb describes this work as "part of [Freije's] wind down" and as separate from any "continuation of [Freije's] work." Yet whether it is labeled part of the wind-down or not, for those customers with ongoing contracts at the time of sale, a Freije employee showed up one day, and a ManWeb employee showed up the next, with no interruption in service or change in the contract. The result, if not the purpose, of the assumption of work and warranties was the continuity of business services for those customers.

ManWeb has also argued that its work on the assumed contracts was "insignificant." By its calculation, ManWeb performed just 730 hours of electrical work related to the assumed contracts in the twelve months following the purchase of Freije. This amounted to just 1.3 percent of ManWeb's total electrical work in that period, and the revenue for that work was less than 1 percent of total revenue in that category for the year. Again, however, this analysis loses sight of Freije's continuity of operations and uses the same focus on the size of the successor that would create the big buyer loophole. A

more appropriate inquiry would examine the volume of the assumed work in comparison with the volume of work performed by Freije before the asset purchase.

The district court found no evidence that ManWeb received any new work from former Freije customers. The court recognized that ManWeb had hoped to keep Freije customers and to draw in new customers with the Freije name. The court interpreted ManWeb's inability to accomplish those goals to mean that the policy concerns behind the MPPAA took on less significance. If Freije customers took their new work elsewhere, the court reasoned, the contribution base could not have been compromised. But that approach does not recognize the harm that a new non-union competitor in the marketplace can cause a multiemployer pension plan. For example, union-shop contributors may have poached some of Freije's customers, but competition from a new non-union competitor may cause those unionized pension contributors to cut their quotes to customers, driving down the contributors' overall revenue and eventually reducing their contributions to the plan. We are skeptical, in any event, that disappointed hopes should save ManWeb from successor liability.

While success in capturing the seller's customers is certainly one way to show customer continuity, it is not the only way. Customers choose and abandon service providers for innumerable reasons, and the years surrounding the 2009 acquisition were fraught with upheaval due to the financial crisis, especially in construction-related businesses. In our view, more important is whether the company made attempts to treat Freije's customers as its own. See *Resilient Floor Covering*, 801 F.3d at 1096 ("Where, however, the objective factors indicate that the new employer 'ma[de] a conscious decision,'…

to take over the predecessor's customer base, the equitable origins of the successor liability doctrine support the conclusion that the successor must pay withdrawal liability."), quoting *Fall River Dyeing*, 482 U.S. at 41. Again, ManWeb had no interest in Freije's tangible assets, but wanted only the intangible assets that would allow it to carry forward the Freije business under its larger umbrella of contracting services.

Based on ManWeb's treatment of Freije's customers as its own through assumption of work and warranties as well as its aggressive attempts to use Freije's goodwill and senior management to maintain connections with Freije's former customers, we find that ManWeb's objective actions sought to maintain continuity of Freije's customers. That factor weighs substantially in favor of successor liability.

D. *Conclusion on Successor Liability*

Successor liability is an equitable doctrine, so the district court's balancing of the equities is reviewed for abuse of discretion. *ManWeb I*, 794 F.3d at 848; *E.E.O.C. v. Northern Star Hospitality, Inc.*, 777 F.3d 898, 901 (7th Cir. 2015). An abuse of discretion can be established, though, when the district court based its holding on an erroneous view of the law. *Ervin v. OS Restaurant Services, Inc.*, 632 F.3d 971, 976 (7th Cir. 2011); *Bal v. Moyer*, 883 F.2d 45, 46–47 (7th Cir. 1989).

We have explained factor by factor where our analysis agrees with and differs from the district court's on the continuity of business before and after the asset purchase agreement. With respect, we find that the district court's approach was mistaken as a matter of law in ways that essentially invite the creation of an arbitrary exception for successor liability for

big buyers and lose sight of the use of intangible assets to present the new business as continuing the old. The policy goals of the MPPAA—preventing increased financial burden on the remaining employers, disincentives to new employers, and fund insolvency—must guide courts in balancing the equities. *ManWeb I*, 794 F.3d at 845–46. Isolated individual factors must be balanced as a whole to determine if successor liability is appropriate. The presence or absence of any one factor "does not compel a particular conclusion." *Resilient Floor Covering*, 801 F.3d at 1091.

We have observed before that when "the successor company knows about its predecessor's liability, knows the precise extent of that liability, and knows that the predecessor itself would not be able to pay a judgment obtained against it, the presumption should be in favor of successor liability." *Worth v. Tyer*, 276 F.3d 249, 260 (7th Cir. 2001), quoting *E.E.O.C. v. Vucitech*, 842 F.2d 936, 945 (7th Cir. 1988). As the Fund points out, ManWeb "was not an innocent purchaser" because it had notice of both the withdrawal liability and the fact that Freije's other debts would prevent it from paying a judgment against it. In our prior decision in this case, we noted that Freije's "contingent withdrawal liability was explicitly included" in the asset purchase agreement. *ManWeb I*, 794 F.3d at 848. The asset purchase agreement also included an indemnification clause to protect ManWeb from claims against Freije, including withdrawal liability. That Freije is likely unable to satisfy that indemnification only serves to underscore the point that without a finding of successor liability the Fund will be injured by unpaid contributions.

The district court considered that competing with the policy goals of the MPPAA was "the social interest in facilitating

the transfer of 'corporate and other productive assets.'" The owners of Freije had debts for which they were personally liable. Those debts were satisfied by the exact purchase price agreed to by ManWeb, while the deal was structured to leave the Fund on the outside looking in. We recognize that those specific debts were able to be satisfied by the unimpeded transfer of assets, and that successor liability may pose an impediment to the transfer of corporate and other productive assets. In *Artistic Furniture*, however, we recognized that "the fact that the imposition of liability will have significant fiscal impact on a successor is not prohibitive." 920 F.2d at 1327.

Ultimately, equitable balancing remains an issue within the sound discretion of the district court. Our disagreement with the district court's legal analysis does not mandate that we substitute our own judgment on the weighing of these factors for the district court's revised judgment. See *Lindquist Ford, Inc. v. Middleton Motors, Inc.*, 557 F.3d 469, 482–83 (remanding for the district court to rebalance the equities where the court "oversimplified [an] aspect of the claim" and relied on a "too-narrow view of the equitable element"). On remand, the district court should reweigh the successor liability factors in light of the considerations we have identified.

*     *     *

The judgment of the district court is VACATED and the case is REMANDED to the district court for further proceedings consistent with this opinion.

MANION, *Circuit Judge*, concurring in the judgment. In order to apply successor liability on a buyer of assets, there must be "substantial continuity in the operation of the business before and after the sale." *Tsareff v. ManWeb Servs., Inc.*, 794 F.3d 841, 845 (7th Cir. 2015) (quoting *Chicago Truck Drivers, Helpers and Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995)). In determining whether such continuity exists, we consider the totality of the circumstances. *See Fall River Dyeing & Finishing Corp. v. N.L.R.B.*, 482 U.S. 27, 43 (1987). I agree with the court that the district court's treatment of some of those circumstances got the relevant analysis backwards. Rather than consider how much of Freije's business ManWeb carried on, the district court measured what percentage of ManWeb's ongoing operations were formerly Freije's operations. Accordingly, I concur in the court's decision to send the case back to the district court so it can review the evidence and re-weigh the factors under the appropriate framework.

I write separately, however, to note my disagreement with the court's own analysis, namely its conclusion that the mere fact ManWeb "made attempts to treat Freije's customers as its own," Maj. Op. at 19, regardless of whether those efforts resulted in any actual continuity of customers, weighs in favor of imposing $661,978 in withdrawal liability on ManWeb. I believe that we should judge based on results, not the parties' ambitions.

**I.**

The entire reason we have successor liability in the multi-employer-pension context is to prevent a company from avoiding its obligations to a pension plan while carrying on business and taking up market share that formerly support-

ed the plan. *See Resilient Floor Covering Pension Trust Fund Bd. of Trustees v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1090 (9th Cir. 2015) (noting how an employer who "stays in the industry but … ceases making payments to the plan" reduces the funds going into the plan by taking work that would otherwise go to plan-supporting employers). That is not the situation we presently have before us. The Fund has presented no evidence to show that ManWeb, for all its efforts, actually carried on Freije's business with Freije's customers in any meaningful way. Nevertheless, the court dismisses ManWeb's "disappointed hopes," and says what matters "is whether [ManWeb] made *attempts* to treat Freije's customers as its own," not whether ManWeb succeeded in doing so. Maj. Op. at 19.

The court supports this assertion with the following quotation from a Ninth Circuit opinion: "Where, however, the objective factors indicate that the new employer 'ma[de] a conscious decision,' … to take over the predecessor's customer base, the equitable origins of the successor liability doctrine support the conclusion that the successor must pay withdrawal liability." *Id.* at 23 (alterations in original) (quoting *Resilient*, 801 F.3d at 1096 (9th Cir. 2015)). That quote can't support the weight the court puts on it. Indeed, the Ninth Circuit's reasoning in that opinion directly contradicts the court's failed-attempt reasoning here. The Ninth Circuit held that whether a company is subject to successor liability is "determined in large part by whether the new employer has taken over the economically critical bulk of the prior employer's customer base." *Id.* at 1084. It is implausible that the Ninth Circuit would emphasize the importance of acquiring the predecessor's customer base but nevertheless indicate

that a company could be held liable just because it tried, unsuccessfully, to do so.

The court's reasoning to the contrary in this case negates and discards the equitable bases of successor liability. While no one factor in the successor-liability analysis is dispositive, there is no fairness in imposing liability on a non-plan employer simply because that employer *tried*, but failed, to continue the business. Applying such a standard would inevitably punish asset purchasers for making business decisions that fail. If a company buys another company's assets, tries to carry on the business, and succeeds, then equity may demand the imposition of successor liability. But it is difficult to imagine a scenario where imposing liability on a company that has not created or sold a product or service under the continued business in the market previously serviced by the plan participants could be equitable.[1] In such a situation, the alleged successor has taken nothing from the plan, so it should owe nothing to the plan.

## II.

The court's opinion rightly avoids what it refers to as the "big buyer loophole," but it ends up advocating for a "deep pocket shakedown." Essentially, the court suggests that

---

[1] The court attempts to devise such a scenario by suggesting that even if a non-plan employer does not capture any of a plan-employer's customer base, it could still affect the plan by causing plan employers to lower their rates to compete, thus reducing their revenues and ultimately their plan contributions. Maj. Op. at 19. However, even plan employers could engage in similar "price wars" among themselves, which would have the same revenue-reducing effects. And even if we should take such attenuated effects into account in the equitable analysis, the Fund presents no evidence that anything like that happened in this case.

ManWeb should pay $661,978 in withdrawal liability for something there is no evidence it took—the bulk of Freije's customer base. The court makes this suggestion despite its own acknowledgment that it should not "substitute [its] own judgment on the weighing of [the] factors for the district court's revised judgment." Maj. Op. at 22. As the district court considers the successor-liability factors anew in light of today's decision, it should keep in mind that there are differing opinions on how to weigh those factors, and that its decision need only rest within the bounds of discretion.