Hamilton, Circuit Judge, concurring.
I join fully in Chief Judge Wood's opinion. I write separately to address concerns raised in Judge Easterbrook's opinion concurring in the judgment. The federal rules of successorship liability under ERISA and federal labor law evolved as equitable doctrines to address the common practice of employers trying to sell their businesses so as to avoid their obligations under federal law. In developing those rules, courts have indeed kept an eye on how those rules would likely affect people to alter their decisions in buying and selling businesses or their assets.
That is evident in Indiana Electrical Workers Pension Benefit Fund v. ManWeb Services, Inc. , 884 F.3d 770 (7th Cir. 2018), discussed in Judge Easterbrook's concurrence. In that case, we remanded for a trial on the issue of successorship liability. That result could not have come as a surprise. At the time of the original asset purchase, the buyer in that case actually did anticipate the possibility of successor liability. The buyer knew the seller faced potential withdrawal liability, and it knew full well that successor liability was a possibility. The buyer negotiated the deal with that prospect in mind, even obtaining an indemnity agreement from the sellers covering this very risk of successor liability. 884 F.3d at 783, citing Tsareff v. ManWeb Services, Inc ., 794 F.3d 841, 848 (7th Cir. 2015) (prior appeal); see also Golden State Bottling Co v. N.L.R.B. , 414 U.S. 168, 172 n.2, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973) (noting successor's ability to negotiate for indemnification regarding liability for predecessor employer's liability for unfair labor practices). Moreover, the parties in ManWeb had structured their asset purchase agreement to deliver all the cash to a different, favored creditor of the (insolvent) seller, stiffing the union pension plan. In short, the result in ManWeb did not impose a tax on a buyer that lacked sufficient foresight or astute lawyers. In the case now before us, the evidence does not show a detailed and well-lawyered asset purchase agreement, as in ManWeb . It does include powerful evidence of a bad-faith effort to continue the earlier business while favoring certain creditors and leaving *906 these Funds unpaid. If bankruptcy would be a better alternative, fairer to all creditors of an insolvent business, so be it.
Easterbrook, Circuit Judge, concurring in the judgment.
I agree with my colleagues that the case must be remanded, but I do not agree with them about what ought to happen next. I have reservations about choice of law and the content of federal successorship law to the extent it applies.
Because the Funds seek to recover from CWG Plastering directly under two federal statutes, the district court has subject-matter jurisdiction. It does not follow that federal law applies to all of the Funds' claims. The Funds present two distinct claims: that CWG Plastering is liable in its own right as the successor of Gianino Plastering and that CWG Plastering must pay a judgment the Funds hold against Gianino Plastering. The first claim arises under federal law. But the second sounds like the same sort of theory that Peacock v. Thomas , 516 U.S. 349, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996), held to rest on state law. My colleagues recognize that Peacock appears to govern the attempt to collect the judgment from an entity that was not a party to it. They add that they do not see in Peacock a "clear signal undermining the Court's longstanding recognition that cases that do rest on ERISA or Plan language are ... typically governed by federal law." Op. 902, emphasis in original. I agree with that statement, but, because the attempt to collect from CWG Plastering the judgment against Gianino Plastering does not rest on ERISA or the Plans' language, this claim is governed by state law. (In Peacock itself the underlying judgment rested on ERISA, which therefore cannot be enough to call for the application of federal law to collection proceedings.) It complicates litigation to have one claim for relief rest on one body of law and a second claim for relief on a different body of law, but this happens all the time. Peacock requires the application of state law to the Funds' effort to collect from B (CWG Plastering) an ERISA judgment entered against A (Gianino Plastering).
The Funds' direct ERISA claim rests on federal law, but the statute does not supply a rule of decision. We must apply federal common law. What is the source of that law? Sometimes federal common law is drawn from state law. See, e.g., United States v. Kimbell Foods, Inc ., 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) ; Kamen v. Kemper Financial Services, Inc ., 500 U.S. 90, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991). In a case arising under federal environmental law-and like this one involving a theory of third-party liability-the Justices raised that possibility but did not decide when it would be appropriate to use state-law principles as the basis of federal rules. United States v. Bestfoods , 524 U.S. 51, 63-64 n.9, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). The Court did not come to a conclusion because the parties had not presented the issue properly. Just so here. The parties have briefed this appeal without so much as mentioning the source-of-law problem, which means that we properly leave the subject for another day.
My colleagues conclude that federal common law creates successorship liability whenever the original and successor businesses are similar enough-where "enough" depends on juggling the many factors a creative legal mind can envision. Maybe so; plenty of judicial opinions proceed that way. My colleagues cite a sample of them. This ambulatory approach confounds businesses by being so vague that it is impossible to know the legal rule until lengthy and expensive suits are over. Cf. Secretary of Labor v. Lauritzen , 835 F.2d 1529, 1539-45 (7th Cir. 1987) (concurring opinion). Our suit is in its third year, and all my colleagues are willing to venture is *907 that "the record would allow reasonable factfinders to differ." Op. 905. I pity the judge who must draft the instructions telling jurors how to proceed.
More: it is necessary to ask how this fundamentally ex post perspective affects parties' behavior ex ante . If "similar enough" firms must pay their predecessors' debts, what happens? Will pension funds be the winners? Today's decision for these Funds may come at the expense of all funds tomorrow.
Consider the facts of Indiana Electrical Workers Pension Benefit Fund v. ManWeb Services, Inc. , 884 F.3d 770 (7th Cir. 2018). ManWeb paid about $260,000 to buy Freije's assets. It sold (or never used) most of the physical assets and was essentially acquiring the old firm's name and goodwill. This led the court to conclude that it may well be Freije's successor and, if so, must pay more than $660,000 that Freije owed to a pension fund. Successorship raised the assets' price to $920,000 (the total to Freije plus the fund), much more than ManWeb agreed to pay.
Businesses fail, and leave creditors unpaid, precisely when their assets are worth less than their liabilities. If buying the assets means also accepting the liabilities, then the assets have a negative value and purchases do not occur. When that happens pension and welfare-benefit funds are worse off, losing even an ability to recover the purchase price from investors for their own benefit. Employees and customers also may suffer losses when a business cannot continue under new ownership.
I use the numbers in ManWeb to illustrate a problem, not to reargue the facts of that case. If as Judge Hamilton suggests the purchase price was below the value of the assets, and the buyer's payment was used for the benefit of an inside creditor rather than the fund, the right response should have been a fraudulent-conveyance action, which would have enabled the fund to realize the assets' true value. A successorship judgment requiring the buyer to pay the full amount of the debt, even when that exceeds the assets' net value, is problematic.
Courts should consider how judge-made rules lead people to alter their behavior. We stressed this recently in Illinois Department of Revenue v. Hanmi Bank , No. 17-1575, 895 F.3d 465, 2018 WL 3340935 (7th Cir. July 9, 2018). When bankruptcy judges allowed the sale of assets free of successorship liability for tax debts, see 11 U.S.C. § 363(f), a tax collector protested that its priority claim had not received the protection to which the Bankruptcy Code entitles it. We asked what that protection would have entailed, given the existence of other creditors (some of them secured) and buyers' ability to make their own adjustments. One potential adjustment would have been not to purchase any assets; then the tax collector also could not have recovered. Another potential adjustment would have been to acquire the assets through a shell corporation without the ability to pay the debtor's back taxes. Again the tax collector could not have recovered. Because several lawful alternatives to the sale in bankruptcy left the tax collector empty-handed, the court concluded that nothing was all the tax collector could get as "adequate protection" under § 363.
What was true in Hanmi Bank is equally true of the Funds' claims. One lawful alternative would have been to have the Funds' claims discharged in bankruptcy. Another would have been a sale of assets in bankruptcy, with liability stripped off under § 363(f) on the same theory as in HanmiBank . The former approach-bankruptcy with no successor-would have been worse for the Funds, the workers, and the customers alike. A sale of assets under § 363(f) also would have left the Funds with nothing. If Curt Gianino had *908 consulted a good bankruptcy lawyer before taking over his father's business, he would have been told these things. Ordering him to pay about $200,000 to the Funds is a steep penalty for the lack of legal advice and will serve as an incentive for family businesses to throw creditors, workers, and customers to the wolves. Is that really what federal common law should achieve?